STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Jason PHILLIPS, Defendant-Appellant.†

Supreme Court

*No. 95–2912–CR. Oral argument January 8, 1998.—Decided May 22, 1998.*

(Also reported in 577 N.W.2d 794.)

†Motion for reconsideration denied July 24, 1998.

For the plaintiff-respondent-petitioner the cause was argued by *Paul Lundsten*, assistant attorney general with whom on the briefs was *James E. Doyle*, attorney general.

For the defendant-appellant there was a brief by *Arthur B. Nathan* and *Nathan Law Office, S.C.*, Racine and oral argument by *Arthur B. Nathan*.

¶ 1. DONALD W. STEINMETZ, J. This case presents three issues for review:

(1) Should an appellate court independently review a circuit court's finding on the voluntariness of a defendant's consent to search, or must the appellate court give deference to the circuit court's determination;

(2) Did the defendant in the present case voluntarily consent to the warrantless search of his bedroom; and

(3) If the defendant voluntarily consented to the search of his bedroom, should the evidence seized during that search be suppressed because drug agents obtained it by exploiting their unlawful entry into the defendant's home.

¶ 2. This case is before the court on petition for review of a published decision of the court of appeals, *State v. Phillips*, 209 Wis. 2d 559, 563 N.W.2d 573 (Ct. App. 1997), reversing a judgment of conviction entered by the circuit court for Racine County, Judge Emmanuel J. Vuvunas. The circuit court denied defendant Jason Phillips' pretrial motion to suppress physical evidence that the drug agents seized during a warrantless search of his home. After the circuit court's denial of his motion to suppress, the defendant pled no contest to possession of marijuana as a repeat offender in violation of Wis. Stat. §§ 161.41(3r) and 161.48(2) (1993–94).[1] The defendant then appealed from the

---

[1] Unless otherwise stated, all future references to Wis. Stats. are to the 1993–94 version of the statutes.

judgment of conviction, and the court of appeals reversed. The court of appeals found that the search of the defendant's home violated the defendant's rights guaranteed by the Fourth Amendment to the United States Constitution[2] and art. I, § 11 of the Wisconsin Constitution.[3] We accepted the State's petition for review and now reverse the decision of the court of appeals.

¶ 3. On September 29, 1994, three agents from the Metro Drug Unit of the Racine County Sheriff's Department went to the home of the defendant, Jason Phillips. According to the testimony of Agent Joseph Zblewski, a confidential informant had provided to the

---

Wis. Stat. § 161.41(3r) provides: "It is unlawful for any person to possess or attempt to possess tetrahydrocannabinols. . . . Any person who violates this subsection may be fined not more than $1,000 or imprisoned for not more than 6 months or both."

Wis. Stat. § 161.48(2) provides:

> If any person is convicted of a 2nd or subsequent offense under this chapter that is specified in s. 161.41. . .(3r), any applicable minimum and maximum fines and minimum and maximum periods of imprisonment under s. 161.41. . .(3r) are doubled. A 2nd or subsequent offense under s. 161.41. . .(3r) is a felony and the person may be imprisoned in state prison.

[2] U.S. Const. amend. IV provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[3] Wis. Const. art. I, § 11 provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

agents information that Phillips was involved in the sale of marijuana. Based on this information, the agents went to the Phillips' home to pursue a "knock and talk" encounter. The agents did not have a warrant to search defendant's home or to arrest the defendant.

¶ 4. The agents testified that, upon their arrival at the defendant's home, they saw a young male they believed to be Phillips at the rear of the residence. The agents then observed this individual descend an exterior stairwell to an area they believed to be a cellar. According to the testimony of the agents, they approached the open cellar doors at the top of the stairwell, and Agent Zblewski called, "Hey, Jason." Phillips responded by coming to the doorway at the bottom of the stairwell where Agent Zblewski could see him. Agent Zblewski testified that both the exterior cellar doors and the door at the base of the stairs were open.

¶ 5. Agent Zblewski then started down the stairs, identified himself as a drug agent, and showed Phillips his sheriff's badge and metro drug unit identification.[4] The three agents descended the stairs and continued

---

[4] The facts of the 29 September 1994 encounter between the agents and the defendant are disputed. The agents' and the defendant's description of the encounter vary. In addition, discrepancies exist among the individual agents regarding when and where consent to search the bedroom area of the basement was obtained from Phillips. When presented with conflicting testimony, findings of fact are required to assess the credibility of the witnesses to determine which version of the event is more credible. We will uphold the circuit court's credibility determination unless such determination goes against the great weight and clear preponderance of the evidence. *See State v. Pires*, 55 Wis. 2d 597, 602–03, 201 N.W.2d 153 (1972); *Madkins v. State*, 50 Wis. 2d 347, 184 N.W.2d 144 (1971); *State v. Johnson*, 177 Wis. 2d 224, 230–31, 501 N.W.2d 876 (Ct. App. 1993). The circuit court here found more credible the testimony of the agents.

through the open door into the basement area where the defendant resided. The basement was described as a small living or storage area, adjacent to which was a closed door leading to the defendant's bedroom. At that time, the defendant identified himself as Jason Phillips. Agent Zblewski did not request and never received from Phillips permission to enter the basement.

¶ 6. Agent Zblewski testified that once he entered the basement he explained to Phillips that the agents had received information that Phillips was in possession of drug paraphernalia and marijuana and that the agents intended to take the items from the defendant. According to Agent Zblewski, Phillips, after a short discussion, admitted that he had the items in his bedroom. Agent Zblewski then asked Phillips if the agents could enter the bedroom and collect the marijuana and any drug paraphernalia because Phillips was in violation of the law for possessing them. Agent Zblewski testified that Phillips responded to this request by opening the door to his bedroom and walking inside. The agents followed Phillips into the bedroom. Agent Zblewski admitted that the agents had not received from Phillips verbal permission to enter the bedroom, but they assumed from Phillips' conduct that they could follow him inside. Once inside the bedroom, Phillips immediately retrieved a small baggie containing marijuana, handed it to the agents, and then pointed out to the agents a number of drug paraphernalia items.

¶ 7. According to Agent Zblewski, he again asked Phillips for permission to search the bedroom after Phillips handed over the baggie of marijuana and pointed out the drug paraphernalia. Agent Zblewski

That finding does not go against the great weight or clear preponderance of the evidence.

testified that Phillips then gave his verbal consent for the agents to search the rest of his bedroom. At that time, Agent Zblewski took Phillips out of the bedroom and into the common storage area of the basement. The other two agents continued to search Phillips' bedroom. While in the common area of the basement, Agent Zblewski and Phillips had a conversation in which Phillips denied dealing marijuana, but made a number of incriminating statements.

¶ 8.   At the conclusion of their search, the agents confiscated 11.5 grams of marijuana, pipes, and other drug paraphernalia. Agent Zblewski testified that, during the encounter, Phillips was not placed in handcuffs and that Phillips was not arrested that day. When leaving, the agents informed Phillips that he would be receiving in the mail citations for possession of marijuana and for possession of drug paraphernalia.

¶ 9.   Phillips was subsequently charged with possession of marijuana as a repeat offender, in violation of Wis. Stat. §§ 161.41(3r) and 161.48(2). In a pretrial proceeding, Phillips filed a motion to suppress the statements he made to Agent Zblewski and the physical evidence obtained during the warrantless search of his home. The circuit court denied the motion.

¶ 10.   Phillips eventually pled no contest to possession of marijuana as a repeat offender. He then appealed from the judgment of conviction, claiming that the circuit court erred in failing to suppress the results of the warrantless search. Phillips argued that the agents' search violated his rights guaranteed by the Fourth Amendment to the United States Constitution and art. I, § 11 of the Wisconsin Constitution.

¶ 11.   The court of appeals reversed, holding that the search of Phillips' home violated his Fourth Amendment protections. The court concluded that the

evidence seized during the search should have been excluded by the circuit court because the consent given by Phillips to search his bedroom was not so attenuated as to purge the taint from the agents' unlawful entry into his home. Upon review of the facts before us, we conclude that Phillips did voluntarily consent to the search of his bedroom and that the agents did not exploit their unlawful entry into Phillips' home. We therefore hold that the agents' warrantless search of Phillips' bedroom and the seizure of evidence therefrom did not violate Phillips' constitutional protections under either the Fourth Amendment or art. I, § 11. Accordingly, we reverse the decision of the court of appeals.

¶ 12. The first issue we address is whether we should review de novo, or grant deference to, the circuit court's finding that the defendant voluntarily consented to the warrantless search of his home. This court has traditionally treated questions of constitutional fact as mixed questions of fact and law, and it has applied a two-step standard when reviewing lower court determinations of constitutional fact. *See State v. Owens*, 148 Wis. 2d 922, 926, 436 N.W.2d 869 (1989); *State v. Rodgers*, 119 Wis. 2d 102, 107–08, 349 N.W.2d 453 (1984); *State v. Woods*, 117 Wis. 2d 701, 715, 345 N.W.2d 457 (1984); *Bies v. State*, 76 Wis. 2d 457, 469, 251 N.W.2d 461 (1977); *State v. Pires*, 55 Wis. 2d 597, 602–03, 201 N.W.2d 153 (1972).

¶ 13. As we explained in *Woods*,[5] an appellate court reviewing issues of constitutional fact examines

---

[5] We recognize that *State v. Woods*, 117 Wis. 2d 701, 715, 345 N.W.2d 457 (1984) was "overruled sub nom" by *Woods v. Clusen*, 794 F.2d 293 (7th Cir. 1986). As we explained in *State v. Jones*, 192 Wis. 2d 78, 93, 532 N.W.2d 79 (1995), *Clusen* was a habeas case connected with *Woods*. " 'The writ of *habeas corpus*

two determinations made by the circuit court, but applies a different standard of review to each. The circuit court first determines the evidentiary or historical facts relevant to the issue. The circuit court then applies those facts to resolve the constitutional questions. *See Woods*, 117 Wis. 2d at 714.

> The standard of review by the appellate court of the trial court's findings of evidentiary or historical facts is that those findings will not be upset on appeal unless they are contrary to the great weight and clear preponderance of the evidence. This standard of review does not apply, however, to the trial court's determination of constitutional questions. Instead, the appellate court independently determines the questions of 'constitutional' fact.

*Id.* at 715 (citations omitted). Wisconsin appellate courts have employed this two-step standard when reviewing circuit courts' conclusions concerning a variety of constitutional challenges. *See, e.g., State v. McMorris*, 213 Wis. 2d 156, 165, 570 N.W.2d 384 (1997) (reviewing whether an independent source existed for an in-court identification made after a lineup that violated an accused's Sixth Amendment right to counsel); *State v. Cummings*, 199 Wis. 2d 721, 748, 546 N.W.2d 406 (1996) (reviewing whether Sixth Amendment right

is *not* a proceeding in the original criminal prosecution but an *independent* civil suit' that 'does *not* afford 'direct' appellate review but only 'collateral' review of the legality of criminal judgments." *Jones*, 192 Wis. 2d at 93 n.3 (citing James S. Liebman & Randy Hertz, 1 *Federal Habeas Corpus Practice and Procedure*, sec. 2.2 at 6–7 (2d ed. 1994)) (emphasis in original). "Since the *habeas corpus* case was a collateral, independent civil suit in a federal court other than the United States Supreme Court, it cannot have 'overruled' the decision by this court in a different, criminal suit." *Id.*

to assistance of counsel was denied); *State v. Jones*, 192 Wis. 2d 78, 93, 532 N.W.2d 79 (1995) (reviewing whether defendant's waiver of *Miranda* rights was valid); *State v. Thiel*, 183 Wis. 2d 505, 516, 515 N.W.2d 847 (1994) (reviewing whether police violated defendant's Fifth Amendment privilege against self-incrimination; *State v. Clappes*, 136 Wis. 2d 222, 234–35, 401 N.W.2d 759 (1987) (reviewing whether defendant's confession was voluntary); *State v. Bangert*, 131 Wis. 2d 246, 283–84, 389 N.W.2d 12 (1986) (reviewing whether guilty plea was voluntary, knowing, and intelligent); *State v. Hartwig*, 123 Wis. 2d 278, 284, 366 N.W.2d 866 (1985) (reviewing whether defendant's Fifth Amendment right to silence had been scrupulously honored); *Woods*, 117 Wis. 2d at 715 (reviewing whether under Fourth Amendment probable cause to arrest existed).

¶ 14. Wisconsin courts have also applied this two-step standard of review when determining whether the facts found by the circuit court satisfy the reasonableness requirements for searches under the Fourth Amendment and art. I, § 11 of the Wisconsin Constitution. *See, e.g., Isiah B. v. State*, 176 Wis. 2d 639, 646, 500 N.W.2d 637 (1993) (reviewing whether under Fourth Amendment student had reasonable expectation of privacy in locker); *State v. Anderson*, 165 Wis. 2d 441, 447, 477 N.W.2d 277 (1991) (reviewing whether consensual search of home was sufficiently attenuated under Fourth Amendment from prior unlawful search); *State v. Whitlock*, 161 Wis. 2d 960, 971, 468 N.W.2d 696 (1991) (reviewing whether defendant had reasonable expectation of privacy in duplex or stereo equipment); *State v. Jackson*, 147 Wis. 2d 824, 829, 434 N.W.2d 386, 388 (1989) (reviewing whether investigatory stop was supported by reasonable suspi-

cion). We have utilized this standard where the reasonableness of a warrantless search was based on the "plain view" doctrine, *see Bies*, 76 Wis. 2d at 469, on the "search incident to an arrest" exception to the warrant requirement, *see State v. Murdock*, 155 Wis. 2d 217, 225–26, 455 N.W.2d 618 (1990), and, as in this case, on the defendant's voluntary consent. *See State v. Turner*, 136 Wis. 2d 333, 344, 401 N.W.2d 827 (1987).

¶ 15.   In *Turner*, we made clear which standard of review this court would apply when reviewing whether a defendant voluntarily consented to the warrantless search of his home.

> [W]e are permitted to independently determine from the facts as found by the trial court whether any time-honored constitutional principles were offended in this case. This is true whether we are examining the voluntariness of defendant's consent to search or whether we are deciding if defendant's confession was voluntarily procured.

*Turner*, 136 Wis. 2d at 344 (citing *Miller v. Fenton*, 474 U.S. 104, 110 (1985) and *Woods*, 117 Wis. 2d at 715).

¶ 16.   The State here asks this court to overrule its decision in *Turner* and to review under a deferential standard the circuit court's determination of the defendant's voluntary consent. We decline to do so. The State notes that federal courts consider voluntariness of consent a factual question that must be determined from the totality of the circumstances, *see, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), and that federal appellate courts grant deference to the circuit courts' determination of the issue. *See, e.g., United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). In addition, the Wisconsin court of appeals appears to

have splintered on whether to apply the two-step analysis or a deferential standard when reviewing a circuit court's determination of voluntary consent. *Compare State v. Flynn*, 190 Wis. 2d 31, 41, 527 N.W.2d 343 (Ct. App. 1994) (reviewing de novo circuit court's determination) *and State v. Xiong*, 178 Wis. 2d 525, 531, 504 N.W.2d 428 (Ct. App. 1993) (same) *with State v. McKinney*, 168 Wis. 2d 349, 356, 483 N.W.2d 595 (Ct. App. 1992) (applying clearly erroneous standard) and *State v. Nehls*, 111 Wis. 2d 594, 598, 331 N.W.2d 603 (Ct. App. 1983) (same).

¶ 17.  The deferential standard employed by the federal courts is based on those courts' interpretation of the United States Supreme Court's decision in *Schneckloth*. In holding that voluntariness of consent is a question of fact, the United Supreme Court in *Schneckloth* primarily relied on its conclusion that a proper analysis of the issue does not turn on per se rules or bright-line tests, but rather is very fact-specific and based on the totality of circumstances involved in each case. *See Schneckloth*, 412 U.S. at 248–49. We too recognize that a circuit court's determination of voluntariness is fact-specific and often turns on "credibility choices resulting from conflicting testimony." *United States v. Freyre-Lazaro*, 3 F.3d 1496, 1501 (11th Cir. 1993). This, however, does not sufficiently distinguish the issue of voluntariness of consent from other constitutional determinations circuit courts must make.

¶ 18.  The determination of voluntariness of consent is no more fact-specific or credibility-based than determining whether a defendant's Sixth Amendment right to silence had been scrupulously honored by investigators; or whether a defendant voluntarily, knowingly, and intelligently entered a guilty plea; or whether the "search incident to an arrest" exception

193

justified a warrantless search of the area around a defendant. In each of these latter three situations, this court applies a two-step analysis to review the circuit court's determination. *See Hartwig*, 123 Wis. 2d at 284; *Bangert*, 131 Wis. 2d at 283–84; *Murdock*, 155 Wis. 2d at 225–26. We see no reason to treat the determination of voluntariness of consent any differently.

¶ 19.   This court's decision to utilize the two-step standard of review to questions of constitutional fact does not turn on whether the underlying determination of the circuit court was fact-specific or based on credibility choices. Rather, the principal reason for independent appellate review of matters of constitutional fact is to provide uniformity in constitutional decision-making. *See State v. Fry*, 131 Wis. 2d 153, 171, 388 N.W.2d 565 (1986); *see also Murdock*, 155 Wis. 2d at 226. It is the duty of the reviewing court to independently apply constitutional principles to the facts as found by the circuit court because "[t]he scope of constitutional protections, representing the basic value commitments of our society, cannot vary from trial court to trial court, or from jury to jury." *Woods*, 117 Wis. 2d at 715 (quoting *State v. Hoyt*, 21 Wis. 2d 284, 305–06, 128 N.W.2d 645 (1964) (Wilkie, J. concurring)). "In applying the skeletal constitutional rule, appellate courts flesh out the rule and provide guidance to litigants, lawyers, and trial and appellate courts." *McMorris*, 213 Wis. 2d at 166. The duty to provide uniformity in constitutional decision-making applies with equal force to the determination of voluntariness of consent.

¶ 20.   We therefore decline the State's request that we overrule our decision in *Turner* and apply a deferential standard when reviewing whether the

defendant voluntarily consented to the warrantless search of his home. Voluntariness of consent is a question of constitutional fact, and we continue to review the circuit court's determination of this mixed issue of fact and law under the two-step analysis laid out in *Turner*. Employing this standard, we will not upset the circuit court's findings of evidentiary or historical fact unless those findings are contrary to the great weight and clear preponderance of the evidence. *See Turner*, 136 Wis. 2d at 344. We will, however, independently apply the constitutional principles to the facts as found to determine whether the standard of voluntariness has been met. *See id.* Having determined the proper standard of review, we next decide the substantive issue of whether the defendant voluntarily consented to the warrantless search of his bedroom.

¶ 21. The Fourth Amendment to the United States Constitution and art. I, § 11, of the Wisconsin Constitution both protect against unreasonable searches and seizures. But for a few inconsequential differences in punctuation, capitalization, and the use of the singular or plural form of a word, the texts of the Fourth Amendment and art. I, § 11 are identical. "This court has consistently and routinely conformed the law of search and seizure under the state constitution to that developed by the United States Supreme Court under the fourth amendment." *Fry*, 131 Wis. 2d at 172; *see also Isiah*, 176 Wis. 2d at 646. We have therefore concluded that the standards and principles surrounding the Fourth Amendment are generally applicable to the construction of art. I, § 11. *See State v. Paszek*, 50 Wis. 2d 619, 624, 184 N.W.2d 836 (1971).

¶ 22. Since physical entry of the home is "the chief evil against which the wording of the Fourth

Amendment is directed," it is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. *Welsh v. Wisconsin*, 466 U.S. 740, 748–49 (1984); *see also Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Maryland v. Buie*, 494 U.S. 325, 331 (1990); *Laasch v. State*, 84 Wis. 2d 587, 594, 267 N.W.2d 278 (1978) (citing *State v. McGovern*, 77 Wis. 2d 203, 214, 252 N.W.2d 365 (1977)); *State v. Elam*, 68 Wis. 2d 614, 621, 229 N.W.2d 664 (1975). In *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), the United States Supreme Court stated the governing fundamental principle: "Thus, the most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Id.* at 454–55 (internal quotation marks omitted); *see also Katz v. United States*, 389 U.S. 347, 357 (1967).

¶ 23. One well-established exception to the warrant requirement of the Fourth Amendment is a search conducted pursuant to consent. *See Schneckloth*, 412 U.S. at 219. Accordingly, a warrantless search conducted pursuant to consent which is "freely and voluntarily given" does not violate the Fourth Amendment. *Id.* The issue here is whether Phillips voluntarily consented to the warrantless search of his bedroom.

¶ 24. There are two determinations made by the circuit court that we must review to determine whether the defendant voluntarily consented to the warrantless search of his bedroom. First, the circuit court expressly found that the defendant in fact consented to the

search of his bedroom. This finding of historical fact is not contrary to the great weight and clear preponderance of the evidence. *See Turner*, 136 Wis. 2d at 344. Consent to search need not be given verbally; it may be in the form of words, gesture, or conduct. *See United States v. Griffin*, 530 F.2d 739, 741 (7th Cir. 1976); *see also United States v. Donlon*, 909 F.2d 650, 652 (1st Cir. 1990). According to the agents' testimony, when asked by Agent Zblewski whether the agents could search the defendant's bedroom, the defendant did not respond verbally, but he opened the door to and walked into his bedroom, retrieved a small baggie of marijuana, handed the baggie to the agents, and pointed out a number of drug paraphernalia items. The defendant's conduct provides a sufficient basis on which to find that the defendant consented to the search of his bedroom. We will not upset the circuit court's finding.

■

¶ 25.　The remaining question concerning the defendant's consent to search the bedroom is whether the defendant's consent was voluntary. When, as here, the State attempts to justify a warrantless search on the basis of consent, the Fourth Amendment requires that the State demonstrate that the consent was voluntarily given. *See Schneckloth*, 412 U.S. at 248; *see also Florida v. Royer*, 460 U.S. 491, 497 (1983); *Rodgers*, 119 Wis. 2d at 114–15; *Nehls*, 111 Wis. 2d at 598. The State has the burden of proving by clear and convincing evidence that the defendant's consent was voluntary. *See Rodgers*, 119 Wis. 2d at 114; *Xiong* 178 Wis. 2d at 532.

■

¶ 26.　The test for voluntariness is whether consent to search was given in the absence of duress or coercion, either express or implied. *See Schneckloth*, 412 U.S. at 226, 248–49; *Rodgers*, 119 Wis. 2d at 110.

We make this determination after looking at the totality of the circumstances, *see Schneckloth*, 412 U.S. at 226; *Rogers*, 119 Wis. 2d at 114, considering both the circumstances surrounding the consent and the characteristics of the defendant. *See Schneckloth*, 412 U.S. at 226, 229; *Xiong*, 178 Wis. 2d at 534–36. No single criterion controls our decision. *See Schneckloth*, 412 U.S. at 226.

¶ 27.   After independently reviewing the facts found by the circuit court under the test for voluntariness established in *Schneckloth* and applied in *Rogers*, we conclude that the State has demonstrated by clear and convincing evidence that the defendant's consent to search his bedroom was voluntary and was not the product of duress or coercion.

¶ 28.   First, the evidence presented illustrates that the agents did not use any misrepresentation, deception, or trickery to entice the defendant to give his consent to search his bedroom. *See Rogers*, 119 Wis. 2d at 112. On the contrary, the State demonstrated that the agents identified themselves as metro drug unit agents and fully informed the defendant of the events leading to their presence at his home and the reasons behind their request to search his bedroom. Although the agents entered the defendant's home without a warrant, they did so while in the presence of and while in communication with the defendant.[6] Prior to asking for his consent to search, the officers disclosed to the

_____

[6] The illegality of the agents' warrantless entry into the defendant's basement is not before us. The State concedes, and the circuit court expressly found, that that the agents' initial entry into the defendant's basement was illegal. The agents did not discover or seize any evidence before they conducted the consensual search of the defendant's bedroom. The extent to

defendant almost all of the information they possessed concerning their interest in his home. When the defendant consented to the search of his bedroom, he was fully aware that the agents did not have a warrant to search his home; that the agents were investigating a report that he was selling marijuana; that they believed there were drugs and drug paraphernalia in the bedroom; and that they intended to confiscate them. In this case, the agents did not mask their identities or misrepresent the purpose for being at the defendant's home; nor did they mislead the defendant into believing that they had a warrant to search his home.

¶ 29.   Second, there is no credible evidence that the agents threatened, physically intimidated, or punished the defendant. *See Schneckloth*, 412 U.S. at 226.[7] The State demonstrated that the agents did not physically subdue or restrain the defendant. The agents did

which this illegal entry tainted the subsequent search of the bedroom is discussed at length below.

[7] The defendant testified that during their search of his home, the agents threatened that if the defendant did not consent to a search, the agents would get a warrant and search the entire house, including the defendant's parents' residence. The agents did not testify that such a threat was made; nor did the circuit court make a finding whether this historical fact occurred. This court may assume that a missing finding was determined in favor of the circuit court's order or judgment. *See Sohns v. Jensen*, 11 Wis. 2d 449, 453, 105 N.W.2d 818 (1960); *In re Estate of Villwock*, 142 Wis. 2d 144, 149, 418 N.W.2d 1 (Ct. App. 1987). Since the circuit court found the defendant's version of the story not credible and concluded that the defendant voluntarily consented to the search, we assume that the court implicitly found that the agents did not make any threats or promises to the defendant before he consented to the search of his bedroom.

not brandish their weapons, and they never placed the defendant in handcuffs. The agents testified that they did not take the defendant into custody or remove him from the premises; nor did they arrest him. Rather, the agents testified that, at the conclusion of their search, the agents informed the defendant that they would send a citation in the mail. In addition, the evidence shows that the agents did not deprive the defendant of any necessities, prolong the encounter to wear down the defendant's resistance, or employ any other coercive interrogation tactics before the defendant consented to the search of his bedroom.

¶ 30.    Third, the evidence presented at the suppression hearing establishes that the questioning of Phillips and the search of his home took place under generally non-threatening, cooperative conditions. The State demonstrated that the agents and the defendant were open and forthright during the encounter, each posing questions and providing information. Although the agents were investigating the defendant's involvement in an alleged crime, they appear to have interacted with the defendant in a truthful and respectful manner. Agent Zblewski testified that, during the search, he had a short conversation with the defendant in which the defendant denied that he sold marijuana, but explained where and how he grew marijuana plants, including a description of the location, number, and sex of his marijuana plants. The defendant testified that, to be nice, he gave to an agent one of his personal magazines to take when the agent left.[8] Such testimony is inconsistent with a conclusion

---

[8] During cross-examination at the suppression hearing, the defendant testified as follows:

Q.   Did you turn any items over to the officers?

that the encounter between the agents and the defendant was coercive or that the defendant's will was in any way overcome by the agents' tactics.

¶ 31.   In addition, other than asking whether the agents had a warrant, the defendant neither acted annoyed with nor objected to the agents' presence in his home. On the contrary, the defendant cooperated with the agents and affirmatively assisted in their search of the bedroom, locating the marijuana and identifying items of drug paraphernalia. The defendant's cooperation and assistance evince both the non-threatening nature of the encounter and the voluntariness of his consent. *See United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993) (listing extent and level of defendant's cooperation with police as one factor in evaluating voluntariness of consent); *United States v. Webb*, 633 F.2d 1140, 1142 (5th Cir. 1981) (finding defendant's assistance in search supports finding consent was voluntary); *Nehls*, 111 Wis. 2d at 599 (same).

¶ 32.   To rebut the evidence presented by the State, the defendant points to the allegedly coercive effect of the agents' presence in the basement. Although we recognize that coercion can be imposed by implicit as well as explicit means, *see Schneckloth*, 412 U.S. at 228, we find that the mere presence of officers in the defendant's basement is insufficient to support a finding of coercion by those officers. *See United States v. Stone*, 471 F.2d 170, 173 (7th Cir. 1972). "To hold that the mere condition of being 'upset' by the presence at one's home of [ ] agents is enough to make any con-

A.   No, I did not. Well, yes, I gave them a magazine.

Q.   A magazine from where?

A.   It was one of my personal magazines which he said that he didn't have to take, but he would like to take it to read, so I figured I would be nice and just give him that.

sent the product of coercion might effectively foreclose almost all searches conducted pursuant to a voluntary consent." *Stone*, 471 F.2d at 173; *see also Nehls*, 111 Wis. 2d at 600. Like the courts in *Stone* and *Nehls*, we decline to so hold.

¶ 33.   The record provides little information concerning the characteristics of the defendant. When assessing voluntariness, courts generally focus on characteristics such as the defendant's age, intelligence, education, physical and emotional condition, and prior experience with police. *See Schneckloth*, 412 U.S. at 226; *Turner*, 136 Wis. 2d at 363. In this case, we know that the defendant was 24 years of age, and therefore not a minor, at the time he consented to the search. *See Haley v. Ohio*, 332 U.S. 596, 599–600 (1948). From the testimony at the suppression hearing, we know that the defendant could hear and respond to questions, and that he could speak and understand the English language. *See Xiong*, 178 Wis. 2d at 536. In addition, no evidence was presented to the circuit court that would suggest that the defendant was uneducated or possessed below average intelligence. *See United States v. Watson*, 423 U.S. at 424–25; *Payne v. Arkansas*, 356 U.S. 560, 563 (1958). Nor was any evidence produced to show that at the time he consented to the search of his home, the defendant was under the influence of intoxicants or other drugs. *See United States v. Rambo*, 789 F.2d 1289, 1296–96 (8th Cir. 1986); *United States v. Gay*, 774 F.2d 368, 376–77 (10th Cir. 1985). Since the defendant was charged as a repeat offender, we know that he had some past experience with the criminal justice system. *See Watson*, 423 U.S. at 424–25; *Laing v. United States*, 891 F.2d 683, 686 (8th Cir. 1989). In short, there was no evidence or testimony suggesting that the defendant was particularly suscep-

tible to improper influence, duress, intimidation, or trickery.

¶ 34.  We also know that the agents did not inform the defendant that he could withhold consent. This fact weighs against, but is not fatal to, a determination of voluntary consent. *See Schneckloth*, 412 U.S. at 227; *U.S. v. Muniz-Melchor*, 894 F.2d 1430, 1440 (5th Cir. 1990). Courts have concluded that although this is a factor to be taken into account, the State is not required to demonstrate the defendant knew that he could refuse consent. *See Schneckloth*, 412 U.S. at 249; *Rodgers*, 119 Wis. 2d at 110. "The state's burden in a consent search is to show voluntariness, which is different from informed consent." *Xiong*, 178 Wis. 2d at 532 (citing *Rodgers*, 119 Wis. 2d at 110). In addition, the circuit court in this case found that, at the time he gave his consent, the defendant in fact knew that he could refuse to give consent to search his bedroom. Accordingly, we give this factor little weight in our consideration of the totality of circumstances surrounding the defendant's consent to search his bedroom.

¶ 35.  Having reviewed the totality of circumstances presented in this case, we find that the State has met its burden of showing by clear and convincing evidence that the defendant's consent to search his bedroom was secured in the "absence of actual coercive, improper police practices designed to overcome the resistance of a defendant." *Xiong*, 178 Wis. 2d at 532; *see Rodgers*, 119 Wis. 2d at 110; *see also Schneckloth*, 412 U.S. at 226, 248–49. We therefore conclude that the defendant voluntarily consented to the search of his bedroom.

¶ 36.  Having determined that the defendant voluntarily consented to the warrantless search of his

bedroom, we must decide the third issue presented in this case: whether the evidence seized during the consensual search of the defendant's bedroom should be excluded because it was seized as a result of the agents' exploiting their unlawful entry into the basement. The State concedes, and the circuit court expressly found, that the agents' initial entry into the defendant's home was "undeniably illegal." The issue then is whether the discovery of the evidence in defendant's bedroom has come at the exploitation of the illegal entry or was sufficiently attenuated as to dissipate the taint caused by that entry. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *Anderson*, 165 Wis. 2d at 447–48.

¶ 37.   Whether evidence should be suppressed because it was obtained pursuant to a Fourth Amendment violation is a question of constitutional fact. *See Anderson*, 165 Wis. 2d at 447. As explained above, we review such mixed questions of fact and law under a two-step standard of review. *See id.* Applying this standard to the issue now before the court, we conclude that the agents did not exploit the unlawful entry into the defendant's home to secure the defendant's consent to search his bedroom.

¶ 38.   The mere fact that consent to search is voluntary within the meaning of *Schneckloth* and *Rogers* does not mean that it is untainted by prior illegal conduct. *See Brown*, 422 U.S. at 603; *Anderson*, 165 Wis. 2d at 448. When, as here, consent to search is obtained after a Fourth Amendment violation, evidence seized as a result of that search must be suppressed as "fruit of the poisonous tree" unless the State can show a sufficient break in the causal chain between the illegality

204

and the seizure of evidence. *Wong Sun*, 371 U.S. at 487–88; *Brown*, 422 U.S. at 602.[9]

■■

¶ 39. In *Brown*, the United States Supreme Court set forth three factors for determining whether the causal chain has been sufficiently attenuated: (1) the temporal proximity of the official misconduct and seizure of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *See Brown*, 422 U.S. at 603–04; *Anderson*, 165 Wis. 2d at 448.[10] In the final analysis,

---

[9] While the analysis and facts considered in the voluntariness and "fruits" tests "overlap to a considerable degree, they address separate constitutional values and they are not always coterminous." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994). It is important "to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality." *Id.* at 1054–55 (quoting Wayne R. LaFave, 3 *Search and Seizure* § 8.2(d) at 190 (1987) (citations omitted)).

[10] The dissent asserts that we should also consider in our attenuation analysis the fact that the agents did not read to the defendant the warnings established in *Miranda v. Arizona*, 384 U.S. 436 (1966). The dissent is correct in stating that the United States Supreme Court does consider *Miranda* an important factor in determining whether a confession is obtained by exploitation of an illegal arrest. *See Brown v. Illinois*, 422 U.S. 590, 603 (1975); *accord State v. Anderson*, 165 Wis. 2d 441, 448, 477 N.W.2d 277 (1991). Unlike in *Brown* and *Anderson*, however, the case now before us does not involve a contested confession or statement. The Fifth Amendment and *Miranda* focus on the privilege against self-incrimination, whereas the issue presented here is governed by the Fourth Amendment right to privacy. *Miranda*, therefore, does not apply because the

however, the question is still whether the evidence objected to has come at the "exploitation of a prior police illegality or instead by means sufficiently attenuated so as to be purged of the taint." *Anderson*, 165 Wis. 2d at 447–48; *see Wong Sun*, 371 U.S. at 488.

¶ 40. Under the temporal proximity factor, we examine "both the amount of time between the illegal entry and the consensual search and the conditions that existed during that time." *Anderson*, 165 Wis. 2d at 448–49; *see Rawlings v. Kentucky*, 448 U.S. 98, 107–08 (1980). In this case, only a few minutes elapsed between the time of the unlawful entry and the consensual search of the defendant's bedroom. This fact weighs against finding the consensual search attenuated. *See United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997). The time span between the illegal entry and the search, however, is not dispositive. *See id.*; *United States v. Kelley*, 981 F.2d 1464, 1471 (5th Cir. 1993); *United States v. Fazio*, 914 F.2d 950, 957–58 (7th Cir. 1990). We must also consider the conditions existing at the time the defendant consented to the search of his bedroom. *See Anderson*, 165 Wis. 2d at 449.

¶ 41. In this case, the conditions surrounding the defendant's consent, although not ideal, lean toward a finding that any taint created by the initial entry had dissipated prior to the consensual search of his bedroom. *See Anderson*, 165 Wis. 2d at 450. As explained

defendant's consent to search was not a testimonial or communicative statement, nor was the request to search equivalent to a custodial interrogation. *See State v. Turner*, 136 Wis. 2d 333, 351, 401 N.W.2d 827 (1987). Since *Miranda* only governs in-custody interrogation, a mere request to search does not invoke its protections. *See id.* Accordingly, it is irrelevant to our limited Fourth Amendment inquiry whether the agents in this case read to the defendant the *Miranda* rights.

above, the agents, after entering the basement, did not restrain the defendant, take him into custody, or arrest him.[11] According to the agents, they and the defendant were open and forthright, each asking questions and providing information. Prior to consenting to the search, the defendant did not act annoyed with or object to the agents' presence in the basement. In addition, when asked whether the agents could search his bedroom, the defendant opened the door to his bedroom, located the marijuana, turned it over to the agents, and pointed out other drug paraphernalia in the bedroom. In the strictest of custodial conditions, the passing of only a short time might not be long enough to purge the initial taint. *See Rawlings*, 448 U.S. at 107. In this case, however, the non-threatening, non-custodial conditions surrounding the search of defendant's bedroom lean toward a finding that any taint created by the agents' unlawful entry into the basement had dissipated when the defendant consented to the search.[12]

---

[11] Compare *Dunaway v. New York*, 442 U.S. 200, 202 (1979) (assessing police action where officers illegally arrested suspect and took him to police station for in-custody interrogation), *Brown*, 422 U.S. at 593–94 (assessing police action where officers broke into suspect's apartment, illegally arrested suspect, held him at gun-point and took him into custody for interrogation), and *Wong Sun v. United States*, 371 U.S. 471, 475 (1963) (assessing police action where officers entered suspects home, dragged him from bed, and handcuffed him).

[12] The dissent contends that the "facts of this case undermin[e]" our characterization as non-threatening and cooperative the encounter between the agents and the defendant. Dissent at 214. To support this assertion, the dissent latches onto the defendant's allegation that the agents threatened to search the whole house if he refused to consent. The dissent, however, does not explain that, in addition to making this alle-

¶ 42.    The second factor we consider in our attenuation analysis is the presence of intervening circumstances between the unlawful entry and the consensual search of defendant's bedroom. *See Anderson,* 165 Wis. 2d at 450–51. The court of appeals concluded and the dissent argues that, due to the temporal proximity involved, the State cannot rely on the presence of intervening circumstances to purge the taint of the unlawful entry. We disagree. Upon review, we conclude that an intervening circumstance did occur and that this factor supports a finding that the agents did not exploit their unlawful entry into defendant's home.

¶ 43.    The only intervening circumstance in this case was the short discussion between Agent Zblewski and the defendant. This discussion was significant, however, because it provided the defendant with sufficient information with which he could decide whether

---

gation, the defendant denied that the door to the basement was open, denied that the agents identified themselves before entering the basement, denied that he led the agents into his bedroom, and denied that he turned over any items to the agents. As we explained in note 7, the circuit court found the defendant's testimony not credible and gave no weight to his allegation that the agents threatened him. Unlike the dissent, we do not accept this alleged threat as an established or credible fact in this case.

The dissent also finds relevant to this inquiry the fact that the defendant's mother was ill at the time of the search and that she died shortly thereafter. There is nothing in the record that suggests the agents in this case knew of the defendant's mother's condition prior to entering the defendant's basement or that they exploited this information to coerce the defendant into consenting to the search. Absent establishing such coercion, these facts, although tragic, are irrelevant and inappropriate to consider in addressing the issues presented in this case.

to freely consent to the search of his bedroom. Agent Zblewski testified that after entering the basement he and the defendant had a conversation in which Agent Zblewski explained the purpose of the visit. According to Agent Zblewski, he answered the defendant's questions and explained that the agents did not have a warrant to search the bedroom. After this conversation, the defendant therefore knew that the agents were investigating an alleged crime and that, without his consent, the agents could not search his bedroom. The information the defendant gained from the conversation with Agent Zblewski illustrates that the defendant was not improperly surprised, frightened, or confused when he consented to the search of his bedroom. *See Anderson*, 165 Wis. 2d at 451. The fact that a short conversation took place between the agents and the defendant supports a finding that the agents did not exploit their unlawful entry into defendant's home by surprising or misleading the defendant into consenting to the search.

¶ 44. The third factor is the purpose and flagrancy of the official conduct. *See Brown*, 422 U.S. at 604; *Anderson*, 165 Wis. 2d at 451. This factor is "particularly" important because it is tied to the rationale of the exclusionary rule itself. *See Brown*, 422 U.S. at 604; *Fazio*, 914 F.2d at 958. "Because the primary purpose of the exclusionary rule is to discourage police misconduct, application of the rule does not serve this deterrent function when police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *Fazio*, 914 F.2d at 958.

¶ 45. The court of appeals found that the agent's entry into defendant's home had a "quality of purposefulness" and the agents' acts were so flagrant as to

require exclusion of the evidence discovered. We disagree. Upon review, we conclude that the conduct of the agents here, although erroneous, did not "rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion" of the evidence discovered during the consensual search of the defendant's bedroom. *Anderson*, 165 Wis. 2d at 451 (quoting *Rawlings*, 448 U.S. at 110).

¶ 46. In this case, there is no dispute that the agents' initial entry into the defendant's home was unlawful. This fact alone, however, does not end our inquiry under this factor. "The question whether the exclusionary sanction is appropriate in a particular case has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by the police conduct." *Illinois v. Gates*, 462 U.S. 213, 223 (1983); *see also United States v. Havens*, 446 U.S. 620, 627–28 (1980). We must, therefore, review the particular conduct of the agents in this case.

¶ 47. We agree with the State that there is no evidence in this case to suggest that the agents' unlawful entry into defendant's home was purposeful or flagrant. The State concedes that the purpose of the agents' trip to the defendant's home was to investigate an alleged crime. The agents testified that they intended to talk with the defendant and to request his permission to search his bedroom. While the agents inappropriately entered the basement to talk with defendant, there is no evidence of bad faith on their part. The agents found no evidence as a result of the illegal entry, nor did they uncover information that they used to influence the defendant to consent to a search. The agents did not go to the defendant's home without individualized suspicion; nor does it appear

that they purposefully searched his home as part of a systematic and continuing series of Fourth Amendment violations. *See United States v. Pierre*, 932 F.2d 377, 389–90 (5th Cir. 1991). There is simply no evidence that the agents' purposely entered the basement without a warrant to "bolster[ ] the pressures for [the defendant] to give consent" or to "vitiate[ ] any incentive on his part to avoid self-incrimination." *Brown*, 422 U.S. at 605 n.12.[13]

¶ 48.   Under this third factor, we must also consider the manner in which the agents entered the defendant's basement. *See Brown*, 422 U.S. at 603. The facts of this case show that the agents did not use violence, threats, or physical abuse to gain entry into the defendant's basement. The agents did not gain entry to the basement by breaking through, unlocking, or even opening a window or door. Nor did the agents use trickery or deception to gain entry into the basement. According to Agent Zblewski's testimony, the

---

[13] Unlike the dissent, we do not read into the agents' testimony a "quality of purposefulness". The agents testified that one purpose of going to the defendant's home was to seek the defendant's permission to search his home. Agent Brian Londre testified that the agents "were just going to talk to Jason [Phillips] and see if [they] could search his living area." In addition, Agent Zblewski testified that, had the defendant asked, the agents would have left. The agents' express purpose therefore was not to search, as suggested by the dissent, but to seek the defendant's permission to search. In our attenuation analysis, this distinction is one of substance not semantics. In addition, even if the agents intended to search the defendant's home, there is no evidence in the record suggesting that the agents intended to exploit an unlawful entry to conduct such a search. As did the circuit court, we characterize the agents' entry as one of error not intention. Reviewing the record, we refuse to presume the officers acted with a "quality of purposefulness."

agents, while in eyesight of and in communication with the defendant, walked through an open door into the basement where defendant resided. The agents did not rush in unannounced, but rather descended the stairs to the basement slowly while they identified themselves and showed the defendant their official badges. The conduct of the agents in the present case, although in error, did not rise to a level of "conscious or flagrant misconduct." *Rawlings*, 448 U.S. at 110.

¶ 49. On balance, having applied to the facts of this case the factors set out in *Brown* and *Anderson*, we conclude that the evidence presented shows that the agents did not exploit their unlawful entry into defendant's home. Although the span of time between the challenged conduct and the consent was short, we cannot find that the consensual search of the bedroom came at the exploitation of the challenged conduct. *See Wong Sun*, 371 U.S. at 488. The consensual search of the defendant's bedroom was therefore purged of any taint created by the unlawful entry. Accordingly, we agree with the circuit court that the evidence discovered during the consensual search of the defendant's bedroom should not have been suppressed. *See id.* The exclusionary rule should not apply when the causal connection between unlawful police conduct and the procurement of evidence is "so attenuated as to dissipate the taint" of the unlawful action. *See Segura v. United States*, 468 U.S. 796, 805 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

¶ 50. Having concluded that the defendant voluntarily consented to the warrantless search of his bedroom and that the agents did not exploit their unlawful entry into the defendant's home, we conclude that the evidence discovered and seized during the consensual search of defendant's bedroom should not have

been suppressed. Accordingly, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 51. ANN WALSH BRADLEY, J. (*dissenting*). Like the court of appeals, I conclude that the evidence seized during the warrantless search should be excluded because it was seized as a result of the agents' exploitation of their concededly unconstitutional entry. Both the facts of this case and precedent support this conclusion.

¶ 52. The issue is whether the connection between the illegal police entry and the subsequent seizure of evidence has become so attenuated as to purge the seizure from the taint of the constitutional violation. It is the State's burden to prove the admissibility of evidence after the primary taint has been established. *See State v. Walker*, 154 Wis. 2d 158, 186, 453 N.W.2d 127 (1990).

¶ 53. The attenuation issue focuses on three primary factors: temporal proximity, intervening circumstances, and the purpose and flagrancy of any official misconduct. *See Brown v. Illinois*, 422 U.S. 590 (1975); *State v. Anderson*, 165 Wis. 2d 441, 448, 477 N.W.2d 277 (1991). The majority's review of the facts of this case leads it to conclude that the defendant's consent to search and the agents' subsequent discovery of illegal drugs were purged of any taint arising from the unconstitutional entry. I disagree.

¶ 54. Consideration of the first factor, temporal proximity, includes measurement of the intervening time as well as consideration of then existing conditions which might outweigh the short time interval.

*See Anderson,* 165 Wis. 2d at 449; *State v. Tobias,* 196 Wis. 2d 537, 548, 538 N.W.2d 843 (Ct. App. 1995). The existence of a "congenial atmosphere" may thus weigh in favor of attenuation. *See Rawlings v. Kentucky,* 448 U.S. 98, 108 (1980); *Anderson,* 165 Wis. 2d at 449. Neither the short time interval nor the existing conditions weigh in favor of attenuation in this case.

¶ 55. The majority's consideration of temporal proximity begins with a concession that "[i]n the strictest of custodial conditions, the passing of only a short time might not be long enough to purge the initial taint." Majority op. at 207. While acknowledging that the temporal proximity consists of "only a few minutes," the majority attempts to save the situation by relying on the "non-threatening, cooperative" atmosphere surrounding the search. Such reliance is misplaced.

¶ 56. In support of this picture of a "non-threatening, cooperative" atmosphere, the majority throughout the opinion maintains that there is no evidence that shows coercive police tactics. There is no evidence that the agents used "any misrepresentation, deception, or trickery to entice the defendant to give his consent to search his bedroom." Majority op. at 198. "There is no credible evidence that the agents threatened. . .the defendant." Majority op. at 199. There is no evidence that the agents "employ[ed] any other coercive interrogation tactics before the defendant consented to the search of his bedroom." Majority op. at 200. There is no evidence that the defendant "act[ed] annoyed with or object[ed] to the agents' presence in the basement." Majority op. at 207.

¶ 57. Contrary to the lack of evidence assertions, the record reflects an alternative that undermines the picture of a "non-threatening, cooperative" encounter.

As the State conceded, the entry into the basement was illegal. Three officers came into the small basement storage area to ask the defendant questions and to search his living quarters for drugs. The officers asked permission to search his room and the defendant inquired if they had a search warrant. The defendant testified:

> A:  They said they didn't need one. And they said if they had to come back with one that they'd have to bust down the door and search through the whole house.

> Q:  Is it your testimony that they said they wanted to search the house or they just wanted to search your room?

> A:  When they first came down, they just said they wanted to search the room. They said if I did not give them permission they would come back with a search warrant and they would search the whole house. . . .

¶ 58.   The officers knew that the defendant's parents lived upstairs in the house. The record reflects that his mother was dying of cancer.[1] The threat of busting down the door and searching the living area of his mother paints a picture of something less than a non-threatening atmosphere. Yet, in the face of this record, the majority clings to its assertion that "[t]here

---

[1] The record indicates that the defendant and his mother were very close and that he sold his share of a small video business so that he could remain in the home and care for his mother during her long illness. The record also indicates Agent Londre recalled that "on that particular night [the defendant] appeared nervous and he did appear concerned for his mother as he related her condition to the agents." She died three weeks after the defendant entered his plea in this case.

is nothing in the record that suggests the agents. . .exploited this information [of the sick mother upstairs] to coerce the defendant into consenting to the search." Majority op. at 208 n.12.

¶ 59. In a further attempt to buttress its analysis, the majority also expansively portrays the findings of the circuit court, effectively claiming that the circuit court uniformly believed the facts as testified to by the three agents and uniformly dismissed the defendant's testimony. Such an expansive portrayal is inconsistent with the more limited findings of the court which only addressed the consent to enter the building and consent to enter the bedroom. The court actually stated its credibility finding as follows:

> there is no doubt that they [the agents] did not have actual consent to go into the basement area. I think that's pretty clear from the testimony. It's also pretty clear to the Court that, and I find the officers' testimony believable, that they did have consent to go into this room, where they found the items, and I'm quite puzzled how to handle the two different situations.

Again specifically referencing the defendant's consent to enter the bedroom, the court then noted that "I find the officers to be credible on that issue, but I don't know how the one interacts with the other."

¶ 60. The credibility findings of the court were limited and the majority's attempt to support its analysis by illusory broader findings is unpersuasive. The findings of the court support the conclusion that the court believed some historical facts in the testimony of

the agents and some historical facts in the testimony of the defendant.[2]

¶ 61.   In addition to some of the facts of this case undermining the majority's picture of "non-threatening, cooperative conditions," case law cited by the majority also undermines the majority's attenuation conclusion. In *Rawlings v. Kentucky*, a defendant detained for approximately 45 minutes pending issuance of a search warrant not only did not object to being detained, but got up, put an album on the stereo, and offered the detaining officers something to drink. Witnesses for both sides indicated that a "congenial atmosphere" existed during the 45-minute detention period. As this court described the *Rawlings* holding in

---

[2] The majority broadly claims that "the circuit court found the defendant's testimony not credible." As the findings above and the record actually demonstrate, it was not the case that the court uniformly dismissed the defendant's testimony in favor of the agents. For example, during his testimony, Agent Londre indicated that the three agents had express permission to enter the defendant's home. Yet, the circuit court noted that "[t]here was, for sure, no consent," a position also acknowledged by the State. Thus, while the circuit court's findings must be read to have concluded that the defendant consented to the ultimate search, the circuit court's findings cannot honestly be read as a unilateral rejection of the defendant's testimony in regards to the conditions existing prior to that consent.

Even more ironically, the majority justifies its finding of attenuation by citing existing conditions such as "when asked whether the agents could search his bedroom, the defendant opened the door to his bedroom, located the marijuana, [and] turned it over to the agents. . . ." Majority op. at 207. Thus, the majority's reasoning comes full circle. The very search and seizure of evidence which the State must demonstrate was not tainted by the unconstitutional entry is the also the majority's chief evidence of the lack of that same taint.

*Anderson*, "the Court found that the non-threatening, congenial conditions that existed during the detention outweighed the relatively short period of time between the initiation of the detention and the admission." *Anderson*, 165 Wis. 2d at 449. Significantly, the *Rawlings* court expressed concern that under the "strictest of custodial conditions," even a 45-minute time span might not be enough to purge the initial taint. *See Rawlings*, 448 U.S. at 107.

¶ 62. In *State v. Anderson*, officers illegally searched the garage of the defendant the day before he was arrested and made incriminating statements. Even after taking the defendant into custody the next day, the officers and the defendant exchanged humorous anecdotes and the defendant indicated that he had intended to call the police that morning anyway. Under these circumstances, this court determined that the combination of the at least seven-hour interval between the illegal search and the defendant's statements and the non-threatening and congenial atmosphere existing during that interval purged any taint from the prior search. *See Anderson*, 165 Wis. 2d at 450.

¶ 63. The standard by which the majority analyzes this case, whether the conditions were "non-threatening [and] non-custodial" is also a puzzling one. While non-threatening conditions may in some cases outweigh temporal proximity, I question the majority's use of a "non-custodial" prong for the attenuation analysis. That prong is not referenced in *Rawlings* or *Anderson* and appears to be contrary to the examinations in those cases. If non-threatening and congenial conditions existing in a custodial situation argue for attenuation, as in *Rawlings*, I fail to see the merit in declaring that because only a non-custodial interaction

occurs the taint is more likely attenuated. As the facts of this case demonstrate, a non-custodial situation may also exhibit threatening conditions.

¶ 64. The majority's attenuation analysis essentially indicates that so long as agents answer questions raised by individuals confronted in their own home, but not taken into custody, and so long as those individuals do not take the added step of attempting to expel the agents, then sufficient "non-threatening [and] non-custodial" conditions exist to dissipate any taint. Such a result is inconsistent with the understanding of the "conditions" element of the temporal proximity factor embraced in *Rawlings* and *Anderson*. It creates a rule whereby extreme temporal proximity may be disregarded in the absence of violence or protest over the constitutional violation and an arrest. The conditions presented in this record do not outweigh the very limited temporal proximity between the unlawful entry and the search. Thus, the temporal proximity factor supports the conclusion that the evidence seized during the search was not sufficiently attenuated from the illegal entry.

¶ 65. In addressing the second attenuation factor, the presence of intervening events, the majority declares, "[t]he fact that a short conversation took place between the agents and the defendant supports a finding that the agents did not exploit their unlawful entry into defendant's home by surprising or misleading the defendant into consenting to the search." Majority op. at 209. I do not believe that the existence of a momentary conversation, without more, inevitably leads to the conclusion that the officers did not exploit their initial illegal entry.

¶ 66. Contrary to the majority's interpretation of the facts, both the court of appeals and the circuit court

acknowledged that the facts of this case allowed no time for an intervening event. The search of the living quarters followed almost immediately after the warrantless entry. In describing the brevity of events, the circuit court stated that "[e]verything happened rather quickly. . . . There obviously was no intervening period of time between the officers coming in and the subsequent search."[3]

¶ 67. The sole case cited by the majority in its brief discussion of the intervening events factor is also easily distinguished from the facts of this case. In applying the intervening event factor, the *Anderson* court concluded that the fact that the defendant was given *Miranda v. Arizona*, 384 U.S. 436 (1966) warnings and had signed a waiver of constitutional rights "weigh in favor of finding that the statement and resultant search were voluntary and sufficiently attenuated from the illegal searches." *Anderson*, 165 Wis. 2d at 448. During the intervening time the *Anderson* defendant also signed a consent to search and seize form.

¶ 68. Here, Phillips was never given *Miranda* warnings.[4] Unlike the defendant in *Anderson*, Phillips

---

[3] It appears inconsistent for the majority, which so strongly relied upon the circuit court's findings for its examination of the conditions surrounding the constitutional violation and search, to now ignore the circuit court's determination that no intervening events could have occurred.

[4] The majority mistakenly concludes that this dissent would apply *Miranda* to this case. I do not believe *Miranda* applicable to the present case in the absence of a custodial arrest. However, I also do not believe that the majority can dispute that one of the chief reasons the taint in *Anderson* was ruled attenuated was the fact that the defendant there had been given a Miranda warning. No such supporting factor exists in this case, because it cannot—there was no custodial arrest. That inequality does not, despite the majority's apparent inter-

did not have any prior knowledge that he might be the target of a police investigation. Unlike in *Anderson*, where the intervening time was at least seven hours between the illegality and the search, here the search followed almost immediately on the heels of the illegal entry. Nothing in this brief chain of events convinces me that this short conversation eliminated any potential for the defendant to be "surprised, frightened, or confused" by the agents' unanticipated and unlawful entry into the defendant's home. Indeed, if the mere existence of a short conversation were all that were required to fulfill this court's attenuation analysis, such an analysis would be a superfluous exercise.

¶ 69. The final factor in the attenuation analysis is an examination of the flagrancy and purposefulness of the agents' misconduct. *See Brown*, 422 U.S. at 604. As this court has noted in the past, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *State v. Douglas*, 123 Wis. 2d 13, 17, 365 N.W.2d 580 (1985) (quoting *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972)). "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton v. New York*, 445 U.S. 573, 589–90 (1980).

¶ 70. In determining that the agents' entry into the defendant's home was not flagrant, the majority again relies upon a paucity of evidence indicating that the agents used force, violence, threats, or deception

pretation of the dissent to the contrary, require application of *Miranda* to this case. However, it does preclude one strong potential foundation for the majority's otherwise weak attenuation conclusion which they attempt to buttress through citation to *Anderson*.

when entering the home. Again, the majority fails to acknowledge the agents' threat to knock down the door and search the living area of the parents if the agents had to return with a warrant. The majority also rests on the absence of any evidence that the defendant "act[ed] annoyed with or object[ed] to the agents' presence. . . ." Majority op. at 207. Such reliance on the absence of evidence disregards the State's burden in proving attenuation. It also fails to acknowledge that this was not a situation where one officer casually entered a defendant's home to ask some questions. Rather, three officers all entered the home for the purpose of questioning the single defendant.

¶ 71.   The conduct of the agents in this case also exhibits a "quality of purposefulness." *See Brown*, 422 U.S. at 605. One of the agents testified that all three officers went to the defendant's home with the expressed purpose of talking to him and of searching his living area. Thus, despite the majority's assertions to the contrary that rely upon the more generalized description of another agent, the concededly improper entry of the agents into the defendant's home for the purpose of conducting a search displays the necessary elements of purposefulness.[5]

¶ 72.   Again citing *Anderson* and *Rawlings*, the majority concludes that "the conduct of the agents here. . .did not 'rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion' of the evidence discovered during the consensual search of the

---

[5] The majority's failure to acknowledge the inconsistencies among the agents' statements trips up the majority opinion. I am aware of no legal doctrine which indicates that the acceptable actions or intentions of two agents, assuming they are to be believed, in any way forgives the purposeful misconduct of a third agent.

defendant's bedroom." Majority op. at 209 (quoting *Rawlings*, 448 U.S. at 110). Once again, the majority's reliance on the holdings of *Anderson* and *Rawlings* ignores the significantly different facts presented to this court.

¶ 73. In *Rawlings*, the officers detained the defendant apparently believing that they could temporarily do so legally and that a warrant to search the premises would allow them to search the occupants therein. The *Rawlings* Court, believing the legality of the detention to be an open question, determined that the conduct was accordingly not so flagrant or purposeful as to require exclusion. *See Rawlings*, 448 U.S. at 110.

¶ 74. Similarly, in *Anderson*, the officers searched the defendant's garage at least twice. The first time they searched the garage the officers were accompanied by and had the consent of the defendant's 15-year-old daughter. While it was later established that the daughter did not have the authority to consent to the search, this court found the officers' reliance upon her consent to be reasonable and did not find purposeful or flagrant misconduct. *See Anderson*, 165 Wis. 2d at 452. In the second search, the officer appeared before a judge and swore to and signed an affidavit for a warrant. For some unexplained reason the officer executed the search with only the affidavit, believing he had a valid warrant. While it was later established the officer had only the affidavit in his possession at the time of the search, the court again found that his conduct was not purposeful or flagrant. *See id.*

¶ 75. The agents in this case never attempted to get a warrant prior to entering the defendant's home. The agents did not rely on another's consent in entering the defendant's home. There is no evidence that the

agents were under the mistaken impression that their actions were legal. Thus, while the facts of this case may not be read to be as flagrant or as purposeful as other potential extreme hypotheticals, the nature of the police intrusion into the defendant's home and its purposefulness cannot be dismissed.

¶ 76. More importantly, even if the majority's argument that the entry was not flagrant or purposeful is taken at face value, that fact is not dispositive of the larger attenuation analysis. As this court noted in an attenuation case dealing with an illegal lineup:

> With respect to the third factor, the fact that the arrest was not flagrant and was not [purposeful] is not enough alone to validate the lineup. Rather, the absence of this factor merely means that less is required in terms of intervening circumstances.

*Walker*, 154 Wis. 2d at 187.

¶ 77. Having considered the three traditional factors under the attenuation exception to the exclusionary rule, I conclude that all three factors argue in favor of excluding the evidence obtained as a result of the constitutional violation. A review of the facts and prior case law supports the conclusion the State has failed to meet its burden of showing sufficient attenuation between the illegal entry and the evidence seized during the search. Accordingly, I dissent.

¶ 78. I am authorized to state that SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE and WILLIAM A. BABLITCH, J. join this opinion.