ANN WALSH BRADLEY, J.
¶ 79. (dissenting.) I agree with the majority that "[c]onsent analysis proceeds under a distinct framework if consent was given following some illegal action by police. Consent, even when voluntary, is not valid when obtained through exploitation of an illegal action by police." Majority op., ¶ 57.
¶ 80. I also agree that "[w]hen . . . consent to search is obtained after a Fourth Amendment violation, evidence seized as a result of that search must be suppressed as 'fruit of the poisonous tree' unless the State can show a sufficient break in the causal chain between the illegality and the seizure of evidence." Id. (quoting State v. Phillips, 218 Wis. 2d 180, 204, 577 N.W.2d 794 (1998)) (alteration in majority).
¶ 81. I part ways with the majority, however, when it comes to the necessity of conducting an attenuation analysis. The majority concludes that it is unnecessary "[b]ecause the police did not exploit the unlawful extension... to gain Hogan's consent." Majority op., ¶ 9. Yet, the very purpose of an attenuation analysis is to determine whether the evidence objected to was obtained by exploitation of a prior police illegality.
*198 ¶ 82. Contrary to the majority's assertions, this case presents the quintessential example of when an attenuation analysis is needed. It is undisputed that the extension of the traffic stop was unconstitutional. The deputy reengaged Hogan a mere 16 seconds later, seeking consent to search.
¶ 83. Where consent is obtained so closely on the heels of acknowledged police misconduct, attenuation analysis is the means by which we determine "whether the evidence objected to was obtained by exploitation of a prior police illegality or instead by means sufficiently attenuated so as to be purged of the taint." State v. Anderson, 165 Wis. 2d 441, 447-48, 477 N.W.2d 277 (1991).
¶ 84. In this case an attenuation analysis reveals that the taint from the deputy's unconstitutional actions was not removed. Therefore the evidence obtained from that search must be suppressed. Accordingly, I respectfully dissent.
I
¶ 85. The majority spends a substantial portion of its analysis attempting to re-litigate the facts of this case to determine whether the extension of the traffic stop was unconstitutional. Majority op., ¶¶ 38-52. Ultimately, it acquiesces, as it must, to the conclusion reached by the circuit court and the court of appeals— the extension of the stop was illegal. Id., ¶ 53.
¶ 86. Acknowledging that designating the extension unlawful does not resolve the case, the majority turns its focus to whether Hogan's consent for the search was tainted by the extension. Id., ¶ 56. It observes that consent "is not valid when obtained through exploitation of an illegal action by police." Id., *199 ¶ 57. It then explains that "[a]ttenuation analysis examines three factors to determine whether consent is sufficiently attenuated from illegal action to be removed from the taint of illegality." Id., ¶ 58. This statement is followed by a lengthy discussion of those three factors. Id., ¶¶ 58-65.
¶ 87. Abruptly shifting paths, the majority fails to apply the three factors. Instead, it considers whether a person in Hogan's position would have felt free to leave after the unlawful extension of the traffic stop. Id., ¶ 63. It determines that a reasonable person would have felt free to leave due to the deputy's statement: "you're free to go." See id., ¶ 69. Based on this rationale, the majority sets aside the preceding illegality in the traffic stop and determines that an attenuation analysis is unnecessary. It states: "[because the police did not exploit the unlawful extension of the stop in order to gain Hogan's consent to search his vehicle, attenuation analysis is unnecessary in this case." Id., ¶ 9. Without conducting an attenuation analysis, the majority ultimately concludes that Hogan's consent to the search was valid. Id., ¶¶ 69, 71.
II
¶ 88. In asserting a reasonable person would have felt free to leave after the unlawful extension of the traffic stop, the majority constructs a fiction.
¶ 89. Hogan had been pulled over for not wearing his seatbelt. After the deputy checked Hogan's license and registration, he asked Hogan to step out of his vehicle. Despite Hogan's clear agitation and expressed desire to go home, the deputy prolonged the stop to such an extent that it constituted an unconstitutional extension of the stop when he asked Hogan to perform *200 multiple sobriety tests. After the tests were completed, the Deputy told Hogan he was free to leave.
¶ 90. However, sixteen seconds after Hogan got back into his vehicle, with the lights on the patrol car still flashing, the deputy walked back to the defendant and reengaged. After asking for and receiving Hogan's consent to search, the deputy found methamphetamine, drug paraphernalia, and two loaded guns in Hogan's vehicle.
¶ 91. Like United States Supreme Court Justice Souter, I have a hard time imagining that an average individual would believe that he has nothing to lose if he refuses to cooperate with the police or that he had any free choice to ignore the police altogether. United States v. Drayton, 536 U.S. 194, 212 (2002) (Souter, J., dissenting) ("It is very hard to imagine that either [defendant] would have believed that he stood to lose nothing if he refused to cooperate with the police, or that he had any free choice to ignore the police altogether. No reasonable passenger could have believed that, only an uncomprehending one.").
¶ 92. The reasonable person "free to leave" standard bears little relationship to what individuals actually believe:
Courts and scholars have repeatedly noted that the free-to-leave test is a highly unrealistic judicial construct that stretches credulity to its limits in assuming that any reasonable person (young or old; guilty or innocent) would literally feel free to leave and ignore a police officer's questions without consequence.
Jonathan S. Carter, You're Only as "Free to Leave" as You Feel: Police Encounters with Juveniles and the Trouble with Differential Standards for Investigatory Stops In Re I.R.T., 88 N.C. L. Rev. 1389, 1410-11 (2010); see also Cty. of Grant v. Vogt, 2014 WI 76, ¶ 31 *201 n.14, 356 Wis. 2d 343, 850 N.W.2d 253 ("To some extent, the 'reasonable person' here is a legal fiction. That defendants often consent to searches of areas that reveal incriminating evidence demonstrates that people often do not feel free to decline an officer's request, even absent a manifest show of authority.").
¶ 93. "[E]mpirical studies over the last several decades on the social psychology of compliance, conformity, social influence, and politeness have all converged on a single conclusion: the extent to which people feel free to refuse to comply is extremely limited under situationally induced pressures." Janice Nadler, No Need to Shout: Bus Sweeps and the Psychology of Coercion, 2002 Sup. Ct. Rev. 153, 155. As Professor LaFave has observed "only the most thick-skinned of suspects" would feel free to leave in some of the circumstances that the Court has found such a freedom. Wayne R. LaFave, Pinguitudinous Police, Pachydermatous Prey: Whence Fourth Amendment "Seizures?", 1991 U. Ill. L. Rev. 729, 739-40.
¶ 94. In the present case, the very nature of the stop was coercive. The deputy necessarily displayed his power and the accoutrements of his authority in order to get Hogan to pull over his vehicle. Once there, the deputy used his authority to require Hogan's compliance with unconstitutional sobriety tests, while another officer looked on. There was no real break between this series of events and the deputy's request to search Hogan's vehicle. Although the deputy told Hogan he was free to leave, within a mere 16 seconds, he reengaged seeking consent to search Hogan's vehicle.
Ill
¶ 95. The majority's suggestion that Hogan's consent to search his vehicle was unrelated to the *202 illegality is also unpersuasive. Would a reasonable person in Hogan's situation, who is on probation and aware that there was methamphetamine, drug paraphernalia, and two loaded guns in his vehicle, blithely consent to a search of his vehicle absent the presence of coercion? The answer is no. The illegal extension of the traffic stop unquestionably played a role in Hogan's consent.
¶ 96. An application of attenuation analysis demonstrates that the consent was not so attenuated from the illegality to render it free of the taint from the unconstitutional extension of the traffic stop.
¶ 97. Attenuation analysis is well-established in our jurisprudence. Originating in the United States Supreme Court, it was developed to help courts determine whether evidence obtained following illegal police activity must be excluded as the fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 488 (1963). The Court set forth the relevant inquiry as follows: "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. (quoting Maguire, Evidence of Guilt, 221 (1959)).
¶ 98. In Brown v. Illinois, 422 U.S. 590, 603-04 (1975), the Supreme Court declined to adopt a "but for" approach based on a causal connection, and announced instead three factors that courts should consider in determining if evidence was sufficiently attenuated from the initial illegality to purge it of the primary taint: temporal proximity, the presence of intervening circumstances, and the flagrancy of the misconduct.
¶ 99. I address each factor in turn:
*203 ¶ 100.’ The first factor, temporal proximity, requires a consideration of "both the amount of time between the illegal [act] and the consensual search and the conditions that existed during that time." Phillips, 218 Wis. 2d at 206.
¶ 101. Sixteen seconds elapsed between the unconstitutional extension of the stop and the time the deputy reengaged Hogan seeking consent to search. In assessing temporal proximity, we have previously determined that the timespan of a few minutes weighs against a consensual search. Id.; see also United States v. Macias, 658 F.3d 509, 524 (5th Cir. 2011) (thirty-second interval between illegal extension of traffic stop and request for consent weighed against attenuation); United States v. Gregory, 79 F.3d 973, 979-80 (10th Cir. 1996) (passage of less than a minute between return of driver's license and request to search not sufficient to purge the taint of an illegal stop); McGaughey v. State, 37 P.3d 130, 141 (Okla. Crim. App. 2001) (the fact that only a few minutes had passed between the illegal detention and the request for consent to search "weighted] heavily against finding the taint cleansed").
¶ 102. The United Stated Supreme Court has stated that in some circumstances even a 45-minute timespan would be insufficient to purge the taint. Rawlings v. Kentucky, 448 U.S. 98, 107 (1980). Here, we are considering a mere 16 seconds that passed between the illegal extension of the stop and the deputy's reengagement, seeking consent to search Hogan's vehicle. Such an abbreviated timespan weighs against attenuation.
¶ 103. In considering temporal proximity, courts take into account the conditions that existed. Admittedly, in some circumstances, the existence of a congenial atmosphere may weigh in favor of attenuation. See *204 Rawlings, 448 U.S. at 109. In this case it does not. Although the atmosphere during the encounter was not overtly threatening, Hogan appeared agitated throughout the stop, expressing his desire to leave. It was only the deputy's assertion of authority that kept him there. The extension of the stop further enhanced the unequal power dynamic between the deputy and Hogan. Far from removing the taint of the illegality, the conditions of the illegal extension of the stop combined with the short time span between the extension and the consent suggest that the consent was tainted by the illegality.
¶ 104. The second factor, intervening circumstances, refers to events occurring between the illegality and the consensual search. Phillips, 218 Wis. 2d at 208. In this case, after the extension of the stop, the deputy told Hogan that he was free to leave and they both returned to their vehicles. Although these circumstances are significant as they could be viewed as an end of the traffic stop, they are not sufficient to wipe clean the slate such that the consent was untainted by the illegality.
¶ 105. This court described what intervening circumstances would support a determination of attenuation in Phillips, 218 Wis. 2d 180. In that case, after illegally entering the defendant's home, officers had a short discussion with the defendant. An officer informed the defendant that they had received information that the defendant had drug paraphernalia and marijuana and explained that they did not have a warrant to search his bedroom. Id. at 209. "This discussion was significant [] because it provided the defendant with sufficient information with which he could decide whether to freely consent to the search." Id. at 208-09. We stated that the discussion "illus *205 trates that the defendant was not improperly surprised, frightened, or confused when he consented to the search of his bedroom," and thus concluded that the officers did not exploit their unlawful entry to obtain consent to search. Id. at 209.
¶ 106. The circumstances in Phillips are not present in this case. At no time did the deputy give any indication that Hogan could decline the deputy's request to search his vehicle. Indeed, during the unlawful extension of the stop, Hogan expressed his belief that if he did not accede to the deputy's requests, it would be used against him. Nothing in the deputy's request for consent to search the vehicle would have dispelled that belief. The intervening circumstances do not remove the taint from the unlawful extension of the stop.
¶ 107. The third factor to consider is "the purpose and flagrancy of the official misconduct." Id. This factor considers whether the conduct of the officers rose "to the level of conscious or flagrant misconduct requiring prophylactic exclusion." Anderson, 165 Wis. 2d at 451 (quoting Rawlings, 448 U.S. at 110).
¶ 108. The deputy's conduct indicates a conscious attempt to gain consent for the search. His exchange with the other officer at the scene suggests that the entire purpose of extending the stop was to find a reason to search Hogan's vehicle. Seeking consent to search is generally consistent with exemplary work of law enforcement. Detaining a suspect longer than reasonably justified by the stop in order to obtain consent crosses the line. I acknowledge, however, that the deputy may not have realized that the extension of the stop was unlawful. Thus, it is hard to conclude that his conduct was flagrant. Overall, this factor appears neutral in determining attenuation.
*206 ¶ 109. Having considered the three traditional factors of an attenuation analysis, I conclude that on balance, they weigh against a determination of attenuation. Although the third factor appears neutral, both the first and second factors weigh against it. The facts of this case and the relevant case law reveal that there was no real break between the unconstitutional extension of the traffic stop and the deputy's request for consent to search Hogan's vehicle.
IV
¶ 110. Although officers may conduct brief seizures when there is reasonable suspicion of a traffic violation, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). As the majority acknowledges, an officer may not extend the stop without additional reasonable suspicion. Majority op., ¶ 35. Absent such reasonable suspicion, the prolonged detention becomes an unlawful seizure, intruding on the citizen's personal liberty.
¶ 111. Here, consent to search Hogan's vehicle was sought only seconds after the illegal extension of the traffic stop. To conclude that consent obtained so closely on the heels of acknowledged police misconduct was valid would lend an air of legitimacy to questionable police tactics. This is the classic example of when the exclusionary rule should apply. See State v. Scull, 2015 WI 22, ¶ 22, 361 Wis. 2d 288, 862 N.W.2d 562 (observing that the two rationales for the exclusionary rule are "assurance of judicial integrity and deterrence of unlawful police conduct"). The evidence should have been suppressed.
*207 ¶ 112. Accordingly, for the reasons set forth above, I respectfully dissent.
¶ 113. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.