DANIEL KELLY, J. (concurring).
¶ 67 I do not believe the state can waive the people's constitutional protections against the state. I nonetheless concur because performing a blood draw on an unconscious individual who has been arrested for operating a motor vehicle while intoxicated in violation of Wis. Stat. § 346.63 ("OWI") is reasonable within the meaning of the Fourth Amendment to the United States Constitution.[1]
¶ 68 This is not the first time we have considered whether a law enforcement officer may perform a blood draw on an individual pursuant to "consent" granted by Wis. Stat. § 343.305. Last term we considered whether such "implied consent" can satisfy the requirements of the Fourth Amendment to the United States Constitution. See State v. Brar, 2017 WI 73, ¶¶ 15, 28-29, 376 Wis. 2d 685, 898 N.W.2d 499 (lead opinion). No opinion attracted a majority of the court. I concurred because Mr. Brar was conscious and had provided express consent to a blood draw, a point on which a majority of the court agreed. However, because the court nonetheless addressed the constitutionality of the implied consent statute, I also explained why I believe that "implied consent" is actually consent granted by the legislature, not the suspect, and why legislative consent cannot satisfy the mandates of our State and Federal Constitutions. See id., ¶¶ 44, 59 (Kelly, J., concurring); see also id., ¶ 15 & n.6 (lead opinion) (discussing federal and state constitutional provisions). I incorporate that analysis here in toto.
¶ 69 The court today is even more ambitious than it was in Brar. Legislatively-granted consent to perform a blood draw is justified, the court says, for the same reasons certain searches of pervasively-regulated businesses do not require warrants. Lead op., ¶¶ 25-28 (citing Marshall v. Barlow's, Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) ; Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) ). But the court misunderstands the significance of that line of cases. The searches considered there were not reasonable because a legislature said they were; they were reasonable because they did not intrude on the affected person's reasonable expectation of privacy. In Colonnade Catering, for *168 example, the United States Supreme Court surveyed the regulatory history of the liquor industry, reaching as far back as England of the eighteenth century. Colonnade Catering, 397 U.S. at 75, 90 S.Ct. 774. The whole point of rehearsing that history was to demonstrate that a liquor retailer had no reasonable expectation his premises would be free from regular governmental inspection. See id. Therefore, the congressionally-developed inspection regime at issue in Colonnade Catering was constitutional because it operated in an area in which the retailer had no reasonable expectation of privacy. The United States Supreme Court has treated the firearm industry in a similar fashion. In United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), the Court said "[i]t is also apparent that if the law is to be properly enforced and inspection made effective, inspections without warrant must be deemed reasonable official conduct under the Fourth Amendment." Id. at 316, 92 S.Ct. 1593. Although the Court chose a stilted means of explaining itself, it is apparent the Court had concluded that the inspection regime in that case did not reach into an area in which the pawn dealer had a reasonable expectation of privacy. See id. The "pervasive-regulation" doctrine, therefore, allows warrantless inspection regimes only when the nature of the business at issue is such that the proprietor does not have an expectation of privacy.
¶ 70 The court should not venture into the "pervasive-regulation" arm of Fourth Amendment jurisprudence without a great deal of fear and trepidation. The rationale justifying this doctrine is too easy to abuse. If increased regulation decreases the areas in which individuals have a reasonable expectation of privacy, then the Fourth Amendment's protections are effectively contingent on the reach of the regulatory state. Through combined legislative and executive activity, oceans of regulations can wear away zones of privacy, allowing warrantless inspection regimes to follow in their wake.
¶ 71 Today's decision is a good example of the doctrine's erosive power. Driving, the court observes, is subject to many regulations, what with all the rules about staying on the right side of the road, speed limits, interactions with emergency vehicles, et cetera. The court could have mined that vein even more deeply than it did-under any definition, driving truly is pervasively-regulated. The temptation to reach for the doctrine under these circumstances is nearly irresistible. And why wouldn't it be? It fairly demands to be heard here. But this is a powerful and unruly force, and when the United States Supreme Court set it in motion, it impressed on the doctrine no internal logic capable of limiting its reach.
¶ 72 The court thinks to wield this doctrine here with limited effect-after all, we are simply justifying a warrantless blood draw. But the court misapprehends how the doctrine functions and, therefore, its consequences. If we are of a mind that this doctrine justifies the implied consent law, we may do so only if we first conclude that regulatory pervasiveness has removed the subject of its operation from the reasonable expectation of privacy. See Colonnade Catering, 397 U.S. at 75, 90 S.Ct. 774 ; Biswell, 406 U.S. at 316, 92 S.Ct. 1593. That is to say, because driving is pervasively regulated, those who travel on Wisconsin's highways have no reasonable expectation of privacy as they engage in that activity. And if that is true, it would sweep away a large body of Fourth Amendment jurisprudence as it relates to traffic stops, searches of automobiles, searches of drivers and passengers, et cetera. Wielding this doctrine as the court does today, if we are serious about its application, calves off *169 a substantial piece of the Fourth Amendment.
¶ 73 For these reasons, and the reasons I discussed in my Brar concurrence, I conclude that the consent implied by Wis. Stat. § 343.305 cannot justify the blood draw performed on Mr. Mitchell.
*
¶ 74 But this case is not Brar, and different reasons justify the blood draw here. The most important distinction between the two cases is this: Mr. Mitchell was not conscious when the law enforcement officer determined that a blood draw was necessary. No Supreme Court decision has yet opined directly on whether a warrant is necessary to perform a blood draw under these circumstances; I believe the interplay among Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), Missouri v. McNeely, 569 U.S. 141, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), and Birchfield v. North Dakota, --- U.S. ----, 136 S.Ct. 2160, 195 L.Ed.2d 560 (2016), leave that question open. Their combined rationale, however, indicates that no warrant is necessary to perform a blood draw when an individual has been arrested for OWI, the suspect is unconscious, and there is a risk of losing critical evidence through the human body's natural metabolization of alcohol.
¶ 75 For more than half a century now the United States Supreme Court has recognized that warrantless blood draws can be constitutional. In Schmerber, the Supreme Court recognized that exigent circumstances can justify a warrantless blood draw from an individual arrested on OWI charges. See Schmerber, 384 U.S. at 770-71, 86 S.Ct. 1826. It said the human body's natural metabolization of alcohol could, under the right circumstances, cause an officer to "reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.' " Id. at 770, 86 S.Ct. 1826 (citation omitted).
¶ 76 More recently, the State of Missouri pressed the Supreme Court to adopt a rule that the natural metabolization of alcohol in the bloodstream presents a per se exigency. McNeely, 569 U.S. at 151-52, 133 S.Ct. 1552. The Court refused, but confirmed the continuing vitality of the rule that the proper circumstances will still justify a warrantless blood draw. "We do not doubt," the Court said, "that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test." Id. at 153, 133 S.Ct. 1552. Therefore, "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." Id. at 156, 133 S.Ct. 1552.
¶ 77 The constitutionality of a warrantless blood draw returned to the Supreme Court in the context of the "search incident to arrest" doctrine in Birchfield. 136 S.Ct. at 2179, 2185. There, the Court said this doctrine justifies a warrantless breath test when the individual has been arrested for OWI; however, it does not justify a warrantless blood draw (at least when the suspect is conscious). See id. at 2185. In reaching this conclusion, the Court placed heavy emphasis on the differing levels of intrusiveness between the two tests. Id. at 2178. Thus, for example, it said that "[b]ecause breath tests are significantly less intrusive than blood tests and in most cases amply serve law enforcement interests, we conclude that a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving." Id. at 2185.
*170 ¶ 78 Availability of the breath test, however, was the driving motivation for its ruling. In the absence of such an option, the reasonableness of a warrantless blood test increases:
We reach a different conclusion with respect to blood tests. Blood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test. Respondents have offered no satisfactory justification for demanding the more intrusive alternative without a warrant.
Id. at 2184.
¶ 79 Combining the reasoning of Schmerber, McNeely, and Birchfield provides the necessary guidance for Mr. Mitchell's case. Schmerber established the ground-rule principle that a warrantless blood draw can be constitutional. See Schmerber, 384 U.S. at 770-71, 86 S.Ct. 1826. McNeely refined the Schmerber holding when it explained that, under the right circumstances, "the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test." See McNeely, 569 U.S. at 153, 133 S.Ct. 1552. Birchfield added two important pieces to the analysis. First, it established that an individual arrested for OWI may be searched incident to his arrest for evidence of intoxication without a warrant. See Birchfield, 136 S.Ct. at 2184. And second, it determined that the method by which law enforcement conducts the search (by breath test as opposed to blood test) depends on the availability of the less-intrusive option. See id. at 2185.
¶ 80 Here is how the Supreme Court's instructions apply in this case. Mr. Mitchell, of course, was arrested for OWI, so Schmerber and McNeely recognize that critical evidence of his intoxication was continually metabolizing away. They also explain that although metabolization alone would not support a warrantless blood draw, when combined with other elements it may. Birchfield says his privacy interest in the evidence of intoxication within his body is no longer a factor because the "search incident to arrest" doctrine is a recognized exception to the warrant requirement. So the only question remaining is whether the search should be conducted via a breath test or a blood test. Birchfield tells us that we must consider the availability of the less intrusive test in making this decision. Mr. Mitchell, however, was unconscious, so the breath test was not an option. A warrantless blood test was reasonable, therefore, because he had been arrested for OWI, evidence of the offense was continually dissipating, there was no telling how long he would be unconscious, his privacy interest in the evidence of intoxication within his body had been eviscerated by the arrest, and no less intrusive means were available to obtain the evanescent evidence.
¶ 81 I recognize that Birchfield holds a cautionary note about blood tests performed on unconscious suspects, but it appears to be in the form of an explanation for why the Court devoted just two sentences to the subject:
It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound intoxication or injuries. But we have no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be.
Birchfield, 136 S.Ct. at 2184-85. Nothing in the opinion indicates the Supreme Court considered how its analytical structure would apply in the context of an unconscious suspect arrested for OWI, and it *171 would be too much like reading tea leaves to give any substantive weight to a statement that simply gives the Court's reasons for not addressing the question we are deciding.[2]
*
¶ 82 Apropos of nothing relevant to this case, the lead opinion says a quartet of the court's members, including the author of this concurrence and the justice who joins it, "label refusal of chemical testing a constitutional right [in State v. Dalton, 2018 WI 85, ¶ 61, 383 Wis. 2d 147, 914 N.W.2d 120 ]." See lead op., ¶ 53 n.13. If the lead opinion means to say that we understand the people of Wisconsin have a constitutionally-protected right to be free from warrantless, unreasonable searches, then it is spot-on. And if the lead opinion further means to say that we recognize that the people of Wisconsin may operationalize that constitutionally-protected right by refusing warrantless, unreasonable searches, then it again hits the bulls-eye. But none of that happened in Dalton. It happened when the people of this nation ratified the Bill of Rights. We have done nothing new here; we only recognize what is already the law.
¶ 83 Ultimately, the lead opinion is of two minds on whether a suspect may refuse a blood test, and it expressed both of them. On the one hand, it says that, "in a state with civil penalties for refusal to submit to a blood draw, 'a person suspected of drunk driving has no constitutional right to refuse to take a blood-alcohol test.' " Lead op., ¶ 38 (quoting South Dakota v. Neville, 459 U.S. 553, 560 n.10, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) ). But almost immediately afterwards it also said: "Of course, consent voluntarily-given before a blood draw may be withdrawn with or without a statutory reminder." Lead op., ¶ 40 (citing United States v. Sanders, 424 F.3d 768, 774 (8th Cir. 2005) ). So which is it? May a suspect refuse a blood test or not?
¶ 84 Perhaps, however, the lead opinion means to say that when a blood test is *172 conducted pursuant to consent-real consent, the kind that people provide, not legislatures-the consent can be withdrawn, but when conducted pursuant to legislatively-provided consent, it cannot. That seems to be the import of the observation that the "right to refuse the blood-alcohol test ... is simply a matter of grace bestowed by the ... legislature." See lead op., ¶ 39 (quoting Neville, 459 U.S. at 565, 103 S.Ct. 916 ). But if that is so, what possible jurisprudential theory allows a statute to make permanent what the constitution makes revocable?[3]
*
¶ 85 For these reasons, I respectfully concur in our court's mandate.
¶ 86 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence.

I use the term "lead" opinion for two reasons. First, I am concerned that without this cue, the reader may mistakenly believe that the lead opinion has any precedential value. Although five justices join in the mandate of the opinion to affirm the court of appeals (Roggensack, C.J., joined by Ziegler, J., Gableman, J., Rebecca Grassl Bradley, J., and Kelly, J.,), it represents the reasoning of only three justices (Roggensack, C.J., joined by Ziegler, J., and Gableman, J.). Justices Rebecca Grassl Bradley and Kelly joined in the mandate, but they would rely on contrary reasoning. Other paragraphs of the lead opinion that Justice Kelly indicates that he joins provide only uncontested factual and legal background that do not include the lead opinion's reasoning. See Justice Kelly's concurrence, ¶ 67 n.1.
Although set forth in two separate opinions, four justices disagree with the reasoning of the lead opinion. Importantly, contrary to the lead opinion, four justices determine that the implied consent laws cannot justify the warrantless blood draw performed in this case (Abrahamson, J., Ann Walsh Bradley, J., Rebecca Grassl Bradley, J., and Kelly, J.).
The lead opinion fails to alert readers as to the non-precedential status of its essential reasoning. Lest the rule of law be unclear to courts and litigants: BY THEMSELVES, THE IMPLIED CONSENT LAWS CANNOT JUSTIFY A WARRANTLESS BLOOD DRAW.

I observe that the concurrence and this dissent are in accord on this point. The concurrence "do[es] not believe that the state can waive the people's constitutional protections against the state." Concurrence, ¶ 67. Accordingly, it concludes that "the consent implied by § 343.305 cannot justify the blood draw performed on Mr. Mitchell." Id., ¶73.

The lead also cites State v. Phillips, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998), for the proposition that consent to search need not be given verbally. Lead op., ¶ 21. In Phillips, when asked by law enforcement whether they could search the defendant's bedroom, "the defendant did not respond verbally, but he opened the door to and walked into his bedroom, retrieved a small baggie of marijuana, handed the baggie to the agents, and pointed out a number of drug paraphernalia items." 218 Wis. 2d at 197, 577 N.W.2d 794. The court concluded that "[t]he defendant's conduct provides a sufficient basis on which to find that the defendant consented to the search of his bedroom." Id. The affirmative assistance provided by the defendant in response to a request to search in Phillips is a far cry from the complete lack of response from the defendant here.