COURT OF APPEALS
DECISION
DATED AND FILED

February 17, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP412-CR**
STATE OF WISCONSIN

Cir. Ct. No. 2022CF21

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

DALTON D. URSULEAN,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Marinette County: JAMES A. MORRISON, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Dalton D. Ursulean appeals a judgment of conviction for one count of possession of narcotic drugs, contrary to WIS. STAT.

§ 961.41(3g)(am) (2023-24).[1]   Ursulean argues that the circuit court erred by denying his motion to suppress evidence discovered during a warrantless search of his bedroom.   More specifically, Ursulean argues that: (1) law enforcement's initial search of his bedroom was not a permissible protective sweep; (2) following the initial search, Ursulean did not voluntarily consent to a subsequent search of his bedroom; and (3) even if he did voluntarily consent to the subsequent search, the evidence discovered during that search should be suppressed as fruit of the poisonous tree because it was discovered as a result of the initial, unlawful search.

¶2     We assume, without deciding, that the initial search of Ursulean's bedroom was not a lawful protective sweep.   We nevertheless conclude that Ursulean's subsequent consent to a search of his bedroom was voluntary.   We further conclude that Ursulean's voluntary consent was sufficiently attenuated from the initial search, such that suppression of the evidence discovered during the subsequent search is not required.   We therefore affirm Ursulean's judgment of conviction.

## BACKGROUND

¶3     On January 19, 2022, law enforcement officers performed a warrantless search of Ursulean's bedroom in a residence located on River Street in the City of Niagara.   Based on evidence discovered during the search, the State charged Ursulean with five counts, each as a repeater: (1) possession of narcotic drugs; (2) possession of tetrahydrocannabinols (THC); (3) possession of a controlled substance; (4) maintaining a drug trafficking place; and (5) possession

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

2

of drug paraphernalia. Ursulean moved to suppress, arguing that the warrantless search violated his rights under the Fourth Amendment.

¶4 At the suppression hearing, Officer Michael Chapman of the Niagara Police Department testified that on the night of the search, he was familiar with the River Street residence and knew that Nina Bennett lived there with her son, Ursulean. Chapman was familiar with Ursulean from his previous experience working at the Marinette County Jail. He also knew from probation records that Audreanna Basso lived at the River Street residence, and he knew that Basso's boyfriend, Daniel Turner, "was also residing there for a time."

¶5 Prior to the search, Chapman had observed multiple vehicles in the driveway of the River Street residence that he knew belonged to "drug users." In addition, the night before the search, a deputy saw a woman at the residence who matched Basso's description. On the morning of the search, Chapman conducted a "garbage pick" at the residence and found marijuana and drug paraphernalia. After finding those items, Chapman contacted the district attorney "and asked her if this was enough for an Act 79 search of Audreanna Basso's living areas."[2] The

---

[2] "Act 79" refers to 2013 Wis. Act 79, which enacted a number of statutory provisions, including WIS. STAT. § 973.09(1d). As relevant here, § 973.09(1d) provides that

> [i]f a person is placed on probation for a felony … his or her residence, and any property under his or her control may be searched by a law enforcement officer at any time during his or her period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of probation.

For purposes of this appeal, it is undisputed that Basso was on felony probation at the time of the challenged search and, as a result, was subject to § 973.09(1d).

district attorney approved the search but clarified that law enforcement "could only search [Basso's] area and the common areas of the home."

¶6     Chapman and several other officers then approached the River Street home and knocked on the door, which was answered by a man named Mathew Lanthier.  The officers asked if Basso was home, and Lanthier responded that she was not.  The officers then entered the home, and one officer—Deputy Oginski—spoke with Lanthier, while Chapman and another officer—Deputy Haws—proceeded upstairs.  At the top of the stairs, there were five closed doors—two on either side of the hall and one at the end of the hall.  After walking upstairs, Chapman could smell the odor of THC, but he could not tell where it was coming from.

¶7     Chapman could hear a voice coming from one of the rooms at the top of the stairs.  He knocked on the second door on the right, which turned out to be a bathroom where Bennett was taking a bath.  After Chapman introduced himself to Bennett and explained why the officers were there, Bennett told him that Basso's room was the first room on the right, but she also stated that Basso no longer lived in the home.

¶8     While Chapman was speaking with Bennett, but before Bennett identified Basso's room, Haws had knocked on the first door on the left, which turned out to be Ursulean's room.  It is not clear from the suppression hearing testimony whether Haws or Ursulean opened the door to Ursulean's room.  Chapman did testify, however, that he did not see Haws enter Ursulean's room.

¶9     Officer Tyler Parr of the Niagara Police Department testified that he assisted in the Act 79 search of the River Street residence.  When he entered the residence's upper floor, he saw Chapman speaking with Bennett and Haws

4

speaking with Ursulean. Parr testified that Haws was in the hallway, and he could not remember whether Ursulean was in the hallway or inside his room. The door to Ursulean's room was open, and Parr could see a "red grinder" of the type typically "used to prepare marijuana for smoking" on a dresser inside the room.

¶10 Parr testified that after he saw the grinder inside Ursulean's room, Bennett identified Basso's room to Chapman, and Parr then searched Basso's room. Inside Basso's room, Parr found items that he believed belonged to Basso, including a prescription pill bottle with her name on it.

¶11 Chapman testified that while Basso's room was being searched, officers escorted Ursulean and Bennett downstairs "to keep everybody together to keep the scene secure." Downstairs, in the living room, Oginski "explained the Act 79 search" to Lanthier, Ursulean, and Bennett. Oginski then asked Ursulean for consent to search the residence, to which Ursulean responded, "No. Get a warrant." Chapman then went outside to his squad car to begin preparing the paperwork for a warrant application, "[b]ased on the odor [of THC] and the observation of paraphernalia" in Ursulean's room. Chapman had a problem with his computer, however, and he therefore went back inside and asked to use Oginski's computer. At that point, Oginski again asked Ursulean if he would consent to a search of the residence, or if the officers should instead obtain a warrant. Ursulean then consented to the search.

¶12 Chapman testified that at the time Ursulean gave his consent, Ursulean was sitting in the living room with Bennett, Lanthier, and a total of four officers, including Chapman. Chapman further testified that no threats were made to Ursulean, Ursulean was not handcuffed or restrained, and the officers did not draw their weapons or use any force. Chapman also testified that "consent forms"

5

were printed off and read to both Bennett and Ursulean, and, thereafter, neither of them revoked their consent to search the residence.

¶13    Bennett also testified at the suppression hearing, stating that on the day of the search, the officers "just came into [her] house and started tearing it apart." According to Bennett, when she emerged from the bathroom, there were three officers in the upstairs hallway, and they began opening doors to the upstairs rooms, including Ursulean's bedroom. The officers then told Bennett and Ursulean to go downstairs to the living room. Bennett testified that she did not think she was free to leave and she did not believe the officers would have left if she had denied consent to search the residence.

¶14    The circuit court issued a written decision denying Ursulean's suppression motion. First, the court concluded that "the entry into the house to perform an Act 79 search was warranted under the circumstances here" because the officers had a "good faith belief" that Basso, "a person currently on DOC supervision, resided at that residence."

¶15    The circuit court next concluded that, in the context of the Act 79 search, it was permissible for the officers to perform a "protective sweep" of the upstairs bedrooms "to protect the police officers by allowing them to determine whether there were any other persons who could constitute a threat to them in these various bedrooms." The court stated that this protective sweep justified the opening of the door to Ursulean's bedroom, regardless of whether it was an officer or Ursulean who actually opened the door. The court continued, "As a result of that protective sweep the police officer saw items in plain view which he was able to see from his position outside of the bedroom. These items gave rise to the plain

6

view exception under the Fourth Amendment and would allow the seizure of those items."

¶16     Next, the circuit court concluded that following the initial protective sweep, Ursulean validly consented to the subsequent warrantless search of his bedroom.  The court explained:

> The officers attempted to obtain a warrant but because of technical difficulties, which the Court believes and finds were genuine and not pretextual, could not initially provide the information to the District Attorney[,] so when Officer [Chapman] came back into the house, which the Court finds he was entitled to do because other officers were still in the house and the Act 79 search at that point was still continuing, [Ursulean] was asked again if he would consent to a search and he agreed that he would. … There is no evidence that anything was said to him, done to him or any threat made to him between the time when he first told the officers to get a warrant until the time was that he gave consent so there is no basis for this Court to hold that consent was not valid.

While the court noted that Bennett's testimony, if believed, "might support a claim of coercion," the court expressly stated that it did not "find her overall testimony to [be] credible."  Because Ursulean voluntarily consented to the search of his bedroom, the court concluded that the search "did not violate [Ursulean's] Fourth Amendment right[s]," and the evidence found in his bedroom should not be suppressed.

¶17     After the circuit court denied Ursulean's suppression motion, the parties reached a plea agreement, pursuant to which Ursulean pled no contest to the charge of possession of narcotic drugs, without the repeater enhancer, and the remaining counts were either dismissed and read in or dismissed outright. Ursulean now appeals, arguing that the court erred by denying his suppression motion.  *See* WIS. STAT. § 971.31(10).

# DISCUSSION

¶18 On appeal, Ursulean argues that the circuit court erred by denying his suppression motion for three reasons. First, he contends that the initial search of his bedroom—during which the room's door was opened and officers observed a marijuana grinder on his dresser—was not a lawful protective sweep. Second, he contends that he did not voluntarily consent to the subsequent, more extensive search of his bedroom. Third, he argues that even if his consent to the second search was voluntary, the evidence found during that search should be suppressed as fruit of the initial, unlawful search.

¶19 This court generally decides cases on the narrowest possible grounds. *Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707. Consistent with this principle, in this case, we assume without deciding that the initial search of Ursulean's room was not a lawful protective sweep. Nevertheless, we conclude that suppression of the evidence discovered in Ursulean's bedroom is not warranted because Ursulean voluntarily consented to the subsequent search of his bedroom, and his consent was sufficiently attenuated from the initial, unlawful search.

## I. Consent

¶20 "One well-established exception to the warrant requirement of the Fourth Amendment is a search conducted pursuant to consent." *State v. Phillips*, 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998). "To determine if the consent exception is satisfied, we review, first, whether consent was given in fact by words, gestures, or conduct; and, second, whether the consent given was voluntary." *State v. Artic*, 2010 WI 83, ¶30, 327 Wis. 2d 392, 786 N.W.2d 430. In this case, Ursulean does not dispute that he consented in fact to a search of his

bedroom. We therefore proceed to the second step of the analysis and consider whether Ursulean's consent was voluntary.

¶21 "The State bears the burden of proving that consent was given freely and voluntarily, and it must satisfy that burden by clear and convincing evidence." *Id.*, ¶32 (citation omitted). Voluntariness is a question of constitutional fact, which is reviewed as a mixed question of fact and law. *Id.*, ¶23. "We review the circuit court's findings of historical fact to determine if they are clearly erroneous, and we independently apply those facts to constitutional principles." *Id.*

¶22 Voluntariness is determined based upon the totality of the surrounding circumstances. *Id*, ¶32. "In considering the totality of the circumstances, we look at the circumstances surrounding the consent and the characteristics of the defendant; no single factor controls." *Id.*, ¶33. The following factors are relevant to the analysis:

> (1) whether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade him to consent; (2) whether the police threatened or physically intimidated the defendant or "punished" him by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he could refuse consent.

*Id.*

¶23 Applying these factors to the instant case, we agree with the State that Ursulean voluntarily consented to the search of his bedroom. With respect to the first factor, there is no evidence that the officers used deception, trickery, or misrepresentation to persuade Ursulean to consent to a search. To the contrary,

9

the officers were candid about their desire to search Ursulean's residence and their intent to obtain a warrant if Ursulean did not consent to a search. Importantly, while police "may not threaten to obtain a search warrant when there are no grounds for a valid warrant, … when the expressed intention to obtain a warrant is genuine ... and not merely a pretext to induce submission, it does not vitiate consent." *State v. Kiekhefer*, 212 Wis. 2d 460, 473, 569 N.W.2d 316 (Ct. App. 1997) (citation modified). Here, the circuit court expressly found that the officers "attempted to obtain a warrant" but were prevented from doing so by "technical difficulties," which were "genuine and not pretextual." Based on the evidence introduced at the suppression hearing, that finding is not clearly erroneous.

¶24 As for the second voluntariness factor, there is no evidence that the officers threatened Ursulean, physically intimidated him, or punished him by depriving him of food or sleep. Ursulean asserts that the officers "did enter the home at around 9 p.m. on a January night, when … Ursulean was already in his bedroom and his mother was in the bathtub." He therefore asserts that, by the time he gave his consent, "it would have been clear to [him] that he would be up late into the night unless he acquiesced to the search." We do not view the timing of the officers' request to search Ursulean's residence as being inherently coercive. To the extent Ursulean may have believed that he would "be up late into the night" unless he consented to a search, that was merely one factor for him to weigh in deciding whether to consent. Notably, Ursulean does not allege that the officers kept him "up late into the night," thus depriving him of sleep, *before* he consented to the search of his bedroom.

¶25 Turning to the third voluntariness factor, Ursulean argues that the conditions surrounding the request to search were "not congenial or cooperative," given that "[s]ix officers entered the home, were giving commands, and at least

10

four were with … Ursulean in the living room while he was asked for his consent to search his bedroom." Ursulean also cites the circuit court's finding that he and the other occupants of the residence were "certainly … under the direction and control of the police officers." Ursulean therefore argues that the third factor "weighs against a finding of voluntariness."

¶26 We are not persuaded. Although Ursulean had undoubtedly been seized at the time he consented to the search, the United States Supreme Court has explained that "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *See United States v. Watson*, 423 U.S. 411, 424 (1976). Indeed, in *Watson*, the defendant's consent to a search was deemed voluntary even though the defendant was under arrest at the time and was not informed that he could refuse consent. *Id.* at 424-25.

¶27 Here, Ursulean does not argue that he was under arrest at the time he consented to the search of his bedroom, and we agree with the State that, instead, he was at most "subject to a temporary investigative seizure." Further, as the State notes, although there were four officers present when Ursulean gave his consent, "the circumstances … were not particularly adversarial, especially given that [the] officers drew no weapon, uttered no threat, applied no physical restraint, and effectively did nothing but temporarily hold [Ursulean] while applying for a search warrant." We agree with the State that, under these circumstances, "if the third factor supports a finding of involuntary consent at all, it does not do so very strongly."

¶28 Addressing the fourth voluntariness factor—i.e., how the defendant responded to the request to search—Ursulean emphasizes that "[a]n initial refusal of a request to search will weigh against a finding of voluntariness." *See Artic*,

11

327 Wis. 2d 392, ¶56. Be that as it may, Ursulean's initial refusal to consent to a search is not dispositive of the voluntariness inquiry. Notably, the only thing that changed between Ursulean's initial denial of consent and his subsequent grant of consent was the officers' stated intent to obtain a warrant. Again, law enforcement's expression of a genuine intent to obtain a warrant does not vitiate an individual's consent to a search. *Kiekhefer*, 212 Wis. 2d at 473. We agree with the State that the fact that Ursulean changed his mind under these circumstances "does not mean that he simply gave in to police pressure" but instead "suggests that [he] recognized that police were actively pursuing another means to gain lawful entry to his bedroom." Consequently, this factor weighs weakly, if at all, in favor of a finding that Ursulean's consent was involuntary.

¶29 As for the fifth voluntariness factor, no evidence was presented at the suppression hearing suggesting that Ursulean had any personal characteristics that would have made him particularly susceptible to police coercion. As the State notes, the record shows that Ursulean was nearly 33 years old at the time he consented to the search. There is nothing in the record to suggest that Ursulean's intelligence, education, or any physical or emotional condition would have negatively affected his ability to provide voluntary consent. Additionally, the record shows that Ursulean had prior experience with the police, as Chapman testified that Ursulean had previously spent time in jail. Under these circumstances, the fifth voluntariness factor weighs in favor of a determination that Ursulean's consent to the search was voluntary.

¶30 Finally, the sixth voluntariness factor directs us to consider whether the officers informed Ursulean that he could refuse consent to the requested

12

search. No witness testified at the suppression hearing that any officer so informed Ursulean.[3] However, the circumstances suggest that Ursulean knew he could refuse to consent to a search because he initially *did* refuse and affirmatively demanded that the officers get a warrant, at which point they began the process of obtaining a warrant. There is nothing in the record to suggest that when the officers subsequently asked Ursulean for the second time whether he would consent to a search, he no longer understood that he could refuse his consent.

¶31 Ultimately, we conclude that, at most, only two of the six voluntariness factors weigh in favor of a determination that Ursulean's consent to the search of his bedroom was involuntary, and even those factors do not strongly support such a determination. Instead, based on the totality of the circumstances, we conclude that Ursulean made a voluntary decision to allow the officers to search his bedroom.

## II. Fruit of the poisonous tree

¶32 As noted above, Ursulean argues that even if his consent to the search was voluntary, we should nevertheless suppress the evidence found in his bedroom because it "was obtained as the result of the unlawful protective sweep" and is therefore fruit of the poisonous tree. When consent to search "is obtained

---

[3] Chapman testified that "consent forms" were printed off and read to Bennett and Ursulean. Those forms, however, were not introduced into evidence at the suppression hearing. In its written decision, the circuit court nevertheless stated that the consent form "is clear on its face and specifically indicates that … the Defendant had been informed it was his constitutional right, 'not to have a search made of the premises and the property owned by me or under my care, custody, and control without a search warrant.'" We agree with Ursulean that because the consent form "is not in evidence and it is not clear what the form contained," the State should not be able to rely on the form or the circuit court's findings as to its contents to meet its burden to show that Ursulean's consent was voluntary.

after a Fourth Amendment violation, evidence seized as a result of that search must be suppressed as 'fruit of the poisonous tree' unless the State can show a sufficient break in the causal chain between the illegality and the seizure of evidence." *Phillips*, 218 Wis. 2d at 204-05 (citation omitted). This inquiry presents a question of constitutional fact, which we review pursuant to the mixed standard of review set forth above. *See id.* at 204; *see also supra* ¶21.

¶33 We consider three factors when determining "whether the causal chain has been sufficiently attenuated: (1) the temporal proximity of the official misconduct and seizure of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *Phillips*, 218 Wis. 2d at 205. "In the final analysis, however, the question is still whether the evidence objected to has come at the 'exploitation of a prior police illegality or instead by means sufficiently attenuated so as to be purged of the taint.'" *Id.* (citation omitted).

¶34 Addressing the temporal proximity factor, Ursulean notes that the State did not "elicit specific testimony" during the suppression hearing "about the length of time that passed between the unlawful protective sweep and the consensual search in this case." Ursulean asserts, however, that "it is reasonable to infer that there was not a significant passage of time."

¶35 The State, in turn, concedes that "a significant amount of time" did not elapse between the protective sweep and Ursulean's consent to a search of his bedroom. Nevertheless, we agree with the State that "the two events hardly occurred contemporaneously." As the State notes, after the protective sweep, officers escorted Ursulean and Bennett downstairs, and Chapman began the process of applying for a search warrant, which required him to go outside to his

14

squad car. Chapman encountered technical difficulties, however, which required him to return to the residence and ask to use another officer's computer. Under these circumstances, we agree with the State that "the transition from contacting Ursulean in his upstairs bedroom to renewing a request to search his bedroom later that evening was anything but a continuous, fluid interaction."

¶36 Regarding the next factor—the presence of intervening circumstances—Ursulean simply makes the conclusory assertion that "the record demonstrates that there were no meaningful intervening circumstances between the protective sweep and … Ursulean's resulting consent." In support of this claim, he notes only that "significant time did not pass between the two events" and that he "remained in the living room under the supervision of law enforcement" during the relevant time period.

¶37 We disagree that no intervening circumstances were present here. In *Phillips*, our supreme court found the presence of intervening circumstances where there was a "short discussion" between the defendant and a law enforcement officer, in which the officer "answered the defendant's questions and explained that the agents did not have a warrant to search [the defendant's] bedroom." *Id.* at 208-09. The court reasoned that "[a]fter this conversation, the defendant … knew that the agents were investigating an alleged crime and that, without his consent, the agents could not search his bedroom." *Id.* at 209. As such, the conversation showed "that the defendant was not improperly surprised, frightened, or confused when he consented to the search of his bedroom" and "support[ed] a finding that the agents did not exploit their unlawful entry into [the] defendant's home by surprising or misleading the defendant into consenting to the search." *Id.*

15

¶38 Similarly, in this case, after the protective sweep, Ursulean was removed to the living room, where Oginski "explained the Act 79 search" that was being conducted. Oginski then asked Ursulean for consent to search the residence, which Ursulean denied. Chapman then began preparing the paperwork to apply for a warrant, but after he encountered technical difficulties, Oginski again asked Ursulean if he would consent to a search of the residence, or if the officers should instead obtain a warrant. Ursulean then consented to the search, after which he was read a consent form and did not revoke his consent. As in *Phillips*, we conclude that Ursulean's conversations with the officers following the protective sweep constitute intervening circumstances supporting a finding that Ursulean "was not improperly surprised, frightened, or confused when he consented to the search of his bedroom." *See id.*

¶39 Finally, the third factor requires us to consider the purpose and flagrancy of the official misconduct. *Id.* at 205. "This factor is 'particularly' important because it is tied to the rationale of the exclusionary rule itself"—i.e., discouraging police misconduct. *Id.* at 209 (citation omitted). Application of the exclusionary rule "does not serve this deterrent function when police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *Id.* (citation omitted).

¶40 Here, it is undisputed that pursuant to Act 79, the officers could permissibly enter the River Street residence and search both Basso's room and any common areas. The allegedly illegal activity occurred when, in connection with the Act 79 search, the officers opened other doors in the residence—including Ursulean's bedroom door—as part of a protective sweep. As the State notes, in carrying out the protective sweep, the officers

knocked on several adjacent doors, announced their presence, and to the extent that they opened doors to ensure the rooms contained no hidden occupants that might try to hurt them, the record is devoid of any evidence that officers used that opportunity to engage in a thorough search for contraband.

We agree with the State that to the extent the officers may have been mistaken in their decision to conduct a protective sweep, the mistake was understandable and does not warrant suppression of the evidence gathered after Ursulean later voluntarily consented to a search of his bedroom.

¶41     Based on all three of the relevant factors, we conclude that Ursulean's voluntary consent to the search of his bedroom was sufficiently attenuated from the challenged protective sweep, such that suppression of the evidence discovered during the search is not required.  Accordingly, the circuit court properly denied Ursulean's suppression motion, and we affirm Ursulean's judgment of conviction.

*By the Court.*—Judgment affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.